John R. ROY, Gary Waller, David Rhoten, Daniel C. Force, Crystal Galloway, Gary W. Holmes, Eric T. Bushey, M.T. Hammond, John R. Lillard, David H. Dixon, Gary Semones, Richard McManus, Jr., Jason Hentz, Patricia H. Dupuis, Curtis Scott Ward, Mike Tanner, Gary A. Seibert, Robert McKeever, John L. Windhorn, Bobby Daggerhart, Melissa P. Harrison, Jay F. Burton, Teresa Hill, B.L. Burnes, Dwight C. Nolff, Thad C. Miller, David W. Shull, David E. Davis, Patricia H. Barnett, Joseph J. Rooney, Kevin G. Hicks, Robbie Kubler, Dalton E. Shull, John V. Ruff, Jr., Eric McFarland, James Garcia, Cynthia D. Plant, Robert D. McClanahan, George E. Hardy, Fern Jenkins, Jason Logan, Mildred H. Miller, Betty Koerner, J. Stuart Platt, Evelyn J. Williams, Jacqueline Fink, Jonathan L. Humphrey, Carroll W. Bledsoe, Jr., Johnathan M. Sebring, Alice H. Bennett, Tony L. Wingard, Stephen C. Sightler, and Tami Leigh Steinlage, Plaintiffs,

v.

COUNTY OF LEXINGTON, SOUTH CAROLINA, Defendant.

No. 3:93–2292–19.

United States District Court,
D. South Carolina,
Columbia Division.

May 13, 1996.

---

■■■■■■■■■■■■■■■■■■■■■■■■

Gerald Frederick Smith of Svalina, Richardson & Smith, Columbia, South Carolina, and James Brown Richardson, Jr., Columbia, South Carolina, for Plaintiffs.

Stephen Terry Savitz and Linda Pearce Edwards of Gignilliat, Savitz & Bettis, Columbia, South Carolina, for Defendant.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., Chief Judge*.

On July 19, 1993, the Plaintiffs, all of whom are current and former emergency

* Chief Judge of the Eastern District of Michigan, sitting by designation in the District of South Carolina.

medical service (EMS) workers, brought this action against the Defendant, Lexington County, South Carolina, alleging, *inter alia,* that they had been denied overtime compensation in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* The case was tried without a jury on November 20 and 21, 1995. The following findings of fact and conclusions of law are submitted by this Court pursuant to Federal Rule of Civil Procedure 52(a).

## I.

During all of the times that are relevant to these proceedings, the EMS was one of five independent departments within Lexington County's Public Safety Division. Lexington County was geographically subdivided into nine response areas for the EMS, each with its own substation. Although some of the substations were jointly housed with fire fighting units, the two departments were physically separated by a wall. All of the EMS employees worked on daily shifts so that each substation would have a staff of two persons on duty throughout every twenty-four hour period. Incoming telephone calls were received from Lexington County's 911 central dispatch office, which screened each call and determined the type of service—law enforcement, fire and/or emergency medical—that was needed.[1]

The EMS teams were dispatched to fires, crime scenes, and automobile accidents whenever there was a report of an injury, the likelihood of an injury, or the dispatcher had no reliable information upon which to determine whether an injury had occurred. Upon the receipt of a request for emergency services, the dispatcher contacted the EMS team whose substation was located within the service area from which the call was made if the team was available. Each team was required to respond to every dispatch call within two minutes of its receipt. However, if an ambulance was on a call within its service area when an emergency call was received, another EMS vehicle in an adjacent service area would be sent to a geographically convenient location so that it could respond to a call from either service area. This procedure was described by Lexington County as being on a "stand by" basis.[2]

## II.

The FLSA generally requires employers to pay overtime compensation to their employees for any hours that they may have worked in excess of forty hours per week. *See* 29 U.S.C. § 207(a).

### A.

Following a decision in February 1985, in which the Supreme Court in *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), declared that the provisions within the FLSA are applicable to state and local governments, Lexington County convened a meeting of its top officials, including its attorney for labor and employment matters, Julian Gignilliat,[3] for the purpose of developing a plan that would conform to the requirements of the FLSA. During this meeting, Gignilliat advised the Lexington County officials that

---

1. In their Exhibit 13, the Plaintiffs analyzed the emergency calls that were received by Lexington County over a randomly selected six-month period. It reflects EMS calls with (1) co-responses from the law enforcement department (to wit, 27.1% of the total), (2) co-responses from the fire department (to wit, 3.4% of the total) and (3) no co-responses (also called medical calls) (to wit, 69.5% of the total). The EMS units were dispatched on approximately 12,452 calls annually which, in turn, represents about 3.8 daily calls for each station during all of the times that are applicable to this case. The 3.8 figure is derived by utilizing the following formula: 12,452 (the total number of EMS calls in the six months multiplied by 2) divided by 365 (the number of days in one year) divided by 9 (the number of crews always on duty). *See* Plaintiffs' Exhibit 13.

2. On the basis of the record and the stipulation by the parties, the Court concludes that the Plaintiffs' Exhibit 13 is an accurate representation of the emergency telephone calls that were made to, and received by, Lexington County EMS units during all of the times that are relevant to this controversy.

3. Gignilliat is an attorney in private practice who had served as an advisor to Lexington County on an as-needed basis for many years prior to *Garcia.*

its EMS workers[4] could be paid under § 7(k) of the FLSA, which contains a partial exemption for those "employee[s] in fire protection activities or . . . law enforcement activities" by increasing the threshold at which their entitlement to overtime compensation would begin. *See* 29 U.S.C. § 207(k) ("§ 7(k)"). He also advised his client that it could legally deduct eight hours per shift for sleeping and two and one-half hours per shift for meals from each employee's paycheck, subject to certain exceptions. Lexington County adopted his recommendations and subsequently incorporated them into an overtime policy for EMS employees.[5]

B.

Lexington County compensated its employees under the law enforcement exemption by paying them for overtime employment after forty-three hours of work within a period of one week.[6] These employees worked on three regularly recurring shifts of twenty-four and one-half hours (8:30 a.m. until 9:00 a.m. on the following day)—which, in essence, constituted a "one day on and two days off" work schedule.[7] Each shift cycle recurred every twenty-one days. A shift contained three designated meal periods (namely, breakfast: 7:00 a.m. to 7:30 a.m.; lunch: 1:00 p.m. to 2:00 p.m.; and dinner: 6:30 p.m. to 7:30 p.m.) and a specific time for sleeping (11:00 p.m. to 7:00 a.m.). The policy

mandated that the EMS employees should not be interrupted during these times, except for an emergency call. Thus, they continued to be responsible for responding to emergency calls at any time during their shift, including the sleep and meal periods. Inasmuch as the EMS teams were obligated to respond to an emergency call within a period of two minutes, they often slept in their uniforms. If any portion of a meal period was interrupted by an emergency call, the affected employees were paid for the entire hour (even if the call was a false alarm).

They were also paid for any time in which they worked during their sleep periods, including compensation for a full hour of work even if only one minute of the hour was interrupted. If the employees were unable to get five consecutive hours of sleep, the entire eight-hour sleep period was counted as hours worked.[8]

Each EMS employee received an annual salary that was paid in equal installments on a bi-weekly basis. Under this policy, regular hours were designated as forty-three hours per week (not forty because of the application of the law enforcement exemption). However, the actual number of hours worked during each week varied within the three-week shift cycle because of the "one-day on, two-days off" schedule. Overtime was then added to the salary according to a "fluctuat-

---

4. EMS workers consist of emergency medical technicians (EMTs) and paramedics. These workers receive instruction on emergency care and transportation and on basic rescue training, which includes the use of hydraulic equipment to extricate automobile accident victims. In order to be certified, EMTs must complete a course in emergency medical care and transportation. Paramedics are EMTs who have received more advanced training.

5. Lexington County adopted its policy on July 1, 1985 prior to the expiration of the grace period that had been established by Congress.

6. The threshold for paying overtime to employees who are engaged in fire activities is greater than those persons who are involved in law enforcement activities (after 53 hours rather than 43 hours). When the overtime policy was first adopted in 1985, Lexington County followed Gignilliat's advice and paid its EMS employees under the fire exemption. However, the County modified its overtime policy two years later and

changed to the law enforcement exception (before Gignilliat changed his advice and encouraged Lexington County to pay its EMS employees under the law enforcement exception). Payment under the fire exemption is not relevant to any compensation at issue here because it occurred prior to the applicable date of the statute of limitations.

7. When Lexington County adopted its overtime policy in 1985, its then-current practice of twenty-four hour EMS shifts was continued, even though Gignilliat had recommended an extension of the shifts by at least fifteen minutes. Lexington County changed the EMS shifts to twenty-four and one-half hours in 1987.

8. The Lexington County policy was more generous than that required by the FLSA. The Code of Federal Regulations only required that an employee get five hours of sleep in the aggregate before the entire sleep period had to be compensated—not five hours of consecutive sleep time. *See* 29 C.F.R. § 785.22(b).

ing work week." Under this method of compensation, employees were paid one-half of their regular hourly rate of pay for each hour of overtime. Since they were paid by salary rather than on an hourly basis, their regular rate of pay was determined by dividing the total number of compensable hours worked in the two-week pay period by their bi-weekly salary.[9]

### III.

■ The FLSA is construed "liberally to apply to the furthest reaches consistent with congressional direction." *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 296, 105 S.Ct. 1953, 1959, 85 L.Ed.2d 278 (1985) (citation and internal quotation marks omitted). "Exemptions from or exceptions to the [FLSA's] requirements are ... narrowly construed against the employer asserting them." *Johnson v. City of Columbia*, 949 F.2d 127, 129–30 (4th Cir.1991) (citation and internal quotation marks omitted). An employer has the burden of proving all of the exceptions and exemptions that it claims, including those under the regulations which have been promulgated by the United States Department of Labor pursuant to the FLSA.[10] *Id.* at 130; *Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282, 286 (4th Cir.1986); *O'Neal v. Barrow County Bd. of Comm'rs*, 980 F.2d 674, 676–77 (11th Cir.1993).

### IV.

■ The first and most basic issue that this Court must resolve is whether the EMS employees were properly classified under § 7(k) of the FLSA. This section provides a partial exemption for "employee[s] in fire protection activities or ... law enforcement activities" by increasing the threshold at which their entitlement to overtime compensation begins. In order for those ambulance and rescue service employees who work in an agency that is independent of fire protection or law enforcement to qualify for an exemption under § 7(k), the employer must comply with the "substantially related" test of 29 C.F.R. § 553.215 and the "80/20" rule of 29 C.F.R. § 553.212.[11]

### A.

■ The "substantially related" test is defined to mean that an employer must demonstrate that the ambulance and rescue service employees (a) "have received training in the rescue of fire, crime and accident victims" and (b) "are regularly dispatched to fires, crime scenes, riots, natural disasters and accidents." § 553.215; *see also Bond v. City of Jackson*, 939 F.2d 285, 288 (5th Cir.1991).

The first prong under § 553.215 is satisfied if the EMS employees received basic rescue training, including the extrication of automobile accident victims. *See Bond*, 939 F.2d at 287–88. Here, the evidence clearly indicates that the Plaintiffs received this type of training. Thus, this test has been satisfied.

---

9. Lexington County substantially modified its policy on July 1, 1995 by converting their EMS employees to a forty-hour per week pay plan. Therefore, the findings of fact and conclusions of law, which have been identified by the Court in this Order, are pertinent only until this date.

10. The Department of Labor, which administers the FLSA through its Wage and Hour Division, has the power to promulgate regulations that interpret the FLSA. *See Condo v. Sysco Corp.*, 1 F.3d 599, 603–05 (7th Cir.1993), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994). Many of the issues in this case concern interpretations of certain regulations that the Department of Labor has established, none of which have been challenged by either party as being inconsistent with the FLSA. *See Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 416–17, 112 S.Ct. 1394, 1401–02, 118 L.Ed.2d 52 (1992).

11. Lexington County contends that (1) the 80/20 rule applies only to ambulance and rescue service workers who are employed by a fire protection or law enforcement agency, and (2) the rule is inapplicable to them because the emergency service under scrutiny in this case is an independent department. Lexington County cites no authority for its interpretation of the regulation. All of the authority of which this Court is aware has concluded that the "80/20" rule is applicable to independent EMS agencies. *See, e.g., O'Neal v. Barrow County Bd. of Comm'rs*, 980 F.2d 674, 681 (11th Cir.1993) ("It would be patently unfair to extend the regulatory protection of the 80/20 rule to firefighters and law enforcement personnel who come under the § 7(k) exemption by specific congressional mandate, but not extend this protection to rescue and ambulance service workers who are brought under the § 7(k) exemption only by implementing regulation."). Thus, this Court determines that the "80/20" rule is applicable to Lexington County.

However, defining and applying the "regularly dispatched" test is a much more difficult task. *See Alex v. City of Chicago*, 29 F.3d 1235, 1242 (7th Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 665, 130 L.Ed.2d 599 (1994). On this issue, Lexington County contends that its burden of showing that the EMS employees were "regularly dispatched" has been satisfied, citing to evidence that its dispatch office sends an ambulance to fires, crimes scenes and automobile accidents on a regular basis when there are (or may be) injuries, and whenever it is not known whether there are any injuries.

■ This Court does not agree. In order for this standard to be satisfied, logic dictates that there must be some comparison of the total number of calls of this type with the number of times that an ambulance responds to them. Otherwise, the word "regularly" would add nothing to the test. The standard for evaluating regularity, which was established by the Ninth Circuit Court of Appeals and subsequently adopted by its sister court in the Sixth Circuit, incorporates this fundamental requirement. *O'Neal*, 980 F.2d at 679; *accord Justice v. Metropolitan Gov't of Nashville*, 4 F.3d 1387 (6th Cir.1993). Specifically, the test requires an analysis of the following factors:

> (1) the percentage of the [emergency s]ervice's total calls that are dispatched to fires, crimes, and automobile accidents; (2) the percentage of total EMT man-hours spent responding to dispatches to fires, crimes, and automobile accidents; and (3) the percentage of the total number of all fires, automobile accident[s], and police calls that occur throughout the county to which the [emergency s]ervice is dispatched.

*O'Neal*, 980 F.2d at 679.

In addressing the first factor under *O'Neal*, about 30.5% of total EMS calls were made concurrently with law enforcement or fire agencies, while the remaining 69.5% were for calls without a law enforcement or fire response, *i.e.*, strictly medical calls. With regard to the second *O'Neal* factor, approximately 10% of the total number of EMT/paramedic working hours were spent on law enforcement and fire calls. Lexington presented no evidence as to the third factor under *O'Neal.*

The first two *O'Neal* factors weigh against regularity—given their low percentages—and do not demonstrate any substantial relationship between the ambulance and the other services.[12] More importantly, there must be some evidence under the third *O'Neal* factor about the total number of law enforcement and fire calls in order to determine if an ambulance "regularly" tends to such calls. The absence of information pertaining to the third factor is strong evidence that Lexington County has failed to establish "regularity."

For the reasons that have been outlined above, the Court concludes that the requirements of § 553.215 have not been satisfied by Lexington County.

### B.

■ The 80/20 rule means that no more than 20% of the ambulance and rescue service employees' total work hours can be spent on non-exempt activities, *i.e.*, other than fire protection or law enforcement activities. § 553.212. All calls are considered to be medical in nature except those that have been specifically classified under the category of fire or law enforcement. Thus, the employer (*i.e.*, Lexington County) must show that no more than 20% of its EMS employees' time is spent on medical calls.[13] In an

---

12. The Court agrees with Lexington County that the first prong is not conclusive of "regularity." There is no specific frequency of fire and law enforcement ambulance calls that establish regularity, such as one-half of total calls. It is possible that an ambulance could respond to every application for fire and law enforcement services, and yet these calls may still consist of less than half of its total telephonic requests. However, this information is relevant, especially

when it is considered in conjunction with the other *O'Neal* factors.

13. The Court agrees with Lexington County and concludes that the employees' time spent while waiting or preparing for calls (*e.g.*, maintaining equipment) is properly characterized as exempt work for purposes of the 80/20 rule. *See O'Neal v. Barrow County Bd. of Comm'rs*, 980 F.2d 674, 682 (11th Cir.1993); *Alexander v. Kansas City,*

effort to meet its burden of proof, Lexington County estimated the percentage of medical calls by dividing the time that was spent on medical calls by its EMS staff into their total work time (with both time periods broken into minutes).[14] During the trial, the EMS coordinator, Tom Gross, opined that the average medical call consumed approximately fifty minutes (to wit, forty minutes for the EMS team to attend to the "emergency" and the remaining ten minutes for them to complete their documentation and clean up procedures at the conclusion of the call). He arrived at the total amount of time spent on medical calls by multiplying the total number of calls that were received during the two month period of his analysis by fifty minutes. Thereafter, in an effort to determine the total amount of work time, Gross multiplied 30 (the number of days in each of the two months of his evaluation) by 14 (the number of working hours per shift)[15] by 9 (the number of crews on duty) by 60 (the number of minutes in an hour). After dividing the time spent by the EMS staff on medical calls into total work time, Gross found that the percentage of medical calls for each of the two months was less than 16%. Thus, it is the position of Lexington County that less than 20% of the total work time is nonexempt, and, by virtue thereof, it has fully satisfied the 80/20 rule.

Although this Court accepts the validity of the formula that was used by Gross, his conclusions, are not acceptable for several reasons.

First, Gross should have expanded his analysis relating to the total EMS work time beyond the two month period to include all the months in Plaintiff's Exhibit 13, given that the parties agreed that this exhibit accurately reflects the calls during the time in question. Utilizing the figures from this exhibit, the Court, following its own calculation of the numbers for all six months, determines the percentage of time that was spent on medical calls to be 22.62%.[16]

Second, this Court determines the expenditure of time that Gross estimated for a medical call was too conservative. An EMT staff person challenged Gross' assessment of an expenditure of ten minutes for documentation and clean up when he asserted that an ambulance spends a minimum of twenty-five minutes or as much as two hours at the conclusion of a call (primarily because of delays at the hospital). While accepting Gross' evaluations as a good faith effort to submit meaningful data into the record, this Court believes that a worker in the field is more knowledgeable of the actual time requirements than an administrator.

On the basis of the record, the Court finds that an average call lasted seventy minutes. Thus, assuming all of the other numbers that were used by Lexington County to be accurate, the seventy minutes that were expended by its employees for an average call yielded more than 20% of time on medical calls. In fact, Lexington County has conceded that the use of seventy minutes for an average call as a basis for any calculations by the Court would result in a figure greater than 20%.[17]

No. 92–2379, 1993 WL 393013, at *8 (D.Kan. Sept. 23, 1993).

**14.** Lexington County used only two of the six months (to wit, November and March 1993) in Plaintiffs' Exhibit 13 in making its calculations.

**15.** Lexington County correctly notes that fourteen is actually quite conservative because the Plaintiffs occasionally worked during their meal and sleep periods, which would result in an increase in the number of total hours worked. However, Lexington County, which has the burden of proof, made no attempt to accurately estimate the number of hours that its EMS employees worked during the meal and sleep periods of each shift.

**16.** To find total work hours, the Court multiplied 182 (the number of days in all six months of the Plaintiffs' Exhibit 13) by 14 (the number of working hours per shift) by 9 (the number of crews always on duty) by 60 (the number of minutes in an hour), which totals 1,375,920. Then, for medical calls, the Court multiplied 50 (Gross' estimate of the average time for a call) by 6,226 (the total calls for the six months in the Plaintiffs' Exhibit 13), which totals 311,300. Finally, dividing 311,300 by 1,375,920 yields 22.62%.

**17.** Lexington County contends that if sixty-five minutes is used as the time for an average medical call and the work hours per shift is raised to fifteen (rather than fourteen) to account for some work during sleep and meal periods, it does not exceed the 20% maximum. Using the estimate

Accordingly, this Court finds that more than 20% of the employees' time is spent on nonexempt work, and the 80/20 rule has not been met. Inasmuch as Lexington County has failed to satisfy the "substantially related" test of § 553.215 and/or the 80/20 rule of § 553.212, this Court concludes that the Plaintiffs are entitled to be paid on a forty-hour per week basis rather than on the basis of the forty-three-hour per week exemption of § 7(k).

## V.

The next issue is whether the Plaintiffs are entitled to be compensated for the time (designated as "meal periods" and "sleep periods" by Lexington County) that had been excluded from their pay.

## A.

■ Initially, the Court must determine whether compensation for the designated meal periods may be excluded from an employee's paycheck when no portion of the meal time is interrupted by a call to duty. Since this Court has already determined that the § 7(k) exemption is not applicable under these facts, the proper regulation is 29 C.F.R. § 785.19,[18] which provides in part:

> *Bona fide meal periods.* Bona fide meal periods are not worktime.... The employee must be completely relieved from duty for the purposes of eating regular meals.... The employee is not relieved if

he is required to perform any duties, whether active or inactive, while eating. 29 C.F.R. § 785.19(a).

The Plaintiffs contend that this Court should strictly construe the phrase "completely relieved from duty" and essentially hold that mealtimes are not compensable if the employees are on call. *See Wahl v. City of Wichita,* 725 F.Supp. 1133, 1144 (D.Kan. 1989); *see also Kohlheim v. Glynn County,* 915 F.2d 1473, 1476–77 (11th Cir.1990); *Burgess v. Catawba County,* 805 F.Supp. 341, 346–47 (W.D.N.C.1992).[19] However, most courts reject such a strict interpretation because it is inconsistent with prevailing Supreme Court precedent which interprets the FLSA, *see Henson v. Pulaski County Sheriff Dept.,* 6 F.3d 531, 533–35 (8th Cir.1993), or because it is inconsistent with the intent of the regulation, *see Reich v. Southern New England Telecommunications Corp.,* 892 F.Supp. 389, 400 (D.Conn.1995). In *Hill v. United States,* 751 F.2d 810, 814 (6th Cir. 1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985), the Sixth Circuit Court of Appeals adopted a more flexible approach, holding that an employee is not entitled to compensation for the mealtime "[a]s long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties, and does not spend time predominantly for the employer's benefit." This standard, which is generally referred to as the "predominant benefit" test, *see Reich,* 892 F.Supp. at 401, is stated in even broader

---

by this Court which was based on (1) the entire six months and (2) the finding that an average medical call is seventy minutes, Lexington County clearly would not meet the 20% standard even if seventeen hours per shift were included as time worked. The equation is as follows: 70 (average time for a medical call) multiplied by 6,226 (the total calls for the six months in the Plaintiffs' Exhibit 13) totals 435,820; 182 (the number of days in all six months of the Plaintiffs' Exhibit 13) multiplied by 17 (number of hours worked per shift) multiplied by 9 (the number of crews always on duty) multiplied by 60 (the number of minutes in an hour) totals 1,670,760; 435,820 divided by 1,670,760 equals 26.08%. Based on the calculations by this Court, the 20% limit was clearly exceeded.

18. If this Court found § 7(k) applicable to the Plaintiffs, 29 C.F.R. § 553.223 would be the

proper regulation. Inasmuch as these regulations use the phrase "completely relieved from duty," this Court concludes that the same meal periods analysis applies to both regulations. *See Reich v. Southern New England Telecommunications Corp.,* 892 F.Supp. 389, 397–98 (D.Conn. 1995).

19. Neither party contends that the Fourth Circuit Court of Appeals has adopted a test for determining the compensability of meals. Although the Fourth Circuit Court of Appeals opined in *Donovan v. Bel–Loc Diner, Inc.,* 780 F.2d 1113, 1115 n. 1 (4th Cir.1985), that employees had "to be completely relieved from duty," it was simply paraphrasing the regulation without attempting to establish a standard. *See Reich v. Southern New England Telecommunications Corp.,* 892 F.Supp. 389, 401 (D.Conn.1995).

terms by some courts. The Tenth Circuit Court of Appeals suggests that the question is whether an employee "is primarily engaged in work-related duties during meal periods. That [the employee] is on-call and has some limited responsibilities during meal periods does not perforce mean the officer is working." *Armitage v. City of Emporia,* 982 F.2d 430, 431 (10th Cir.1992) (expressly rejecting *Wahl,* 725 F.Supp. at 1133) (citation and quotation marks omitted).[20]

Applicable case law and logic mandate that the "predominant benefit" test should be applied here. Under *Armitage,* this Court concludes that the EMS workers were not primarily engaged in work-related activities during meal periods. These employees had no official responsibilities during this period of time other than to respond to an emergency call if called upon. In fact, the policy of Lexington County was not to interrupt the lives of these employees during their mealtimes for any reason except for an emergency call. Applying the test under *Hill,* the employees were not acting primarily for the benefit of their employer during the meal periods. The only limitation upon their activities was a restrictive policy which required them to remain within their designated service area while on duty. During this period of time, they were authorized to drive their ambulance to a restaurant for food. Although these meals were sometimes interrupted by emergency calls, the total number of interruptions were certainly less than half of their meal periods, given that each ambulance received only 3.8 calls per day on average. Thus, this Court concludes that the requirements of § 785.19 have been satisfied, and Lexington County's policy on meal periods was appropriate under the circumstances.

### B.

■ Next, the Court must decide whether the EMS employees are entitled to compensation for the eight hours that were designated as "sleep time." The regulation that guides our analysis provides in part:

> (a) *General.* Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude ... a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep.... Where no express or implied agreement to the contrary is present, the 8 hours of sleeping time ... constitute hours worked.

> (b) *Interruptions of sleep.* If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

29 C.F.R. § 785.22 (citations omitted).[21] Pursuant to this regulation, the first question involves whether the employee usually receives an uninterrupted night's sleep. The Plaintiffs contend that the entire period which has been designated for sleep purposes (to wit, eight hours) must be uninterrupted a majority of the time for the regulation to apply. If the employees are correct, the regulation is not applicable to them because the evidence and testimony at trial established that their sleeping period was interrupted by an emergency call to duty at least 60% of the time. However, Lexington County argues that a "night's sleep" means a reasonable night's sleep, which is defined as being a minimum of five hours under 29 C.F.R. § 785.22(b). Other courts have adopted the view that has been advanced by Lexington County. *See Bouchard v. Regional Governing Bd.,* 939 F.2d 1323, 1332 (8th Cir.1991) ("The regulation defines 'uninterrupted' as meaning, that if the employee cannot get at least 5 hours sleep during the

---

**20.** *Armitage* applied § 785.19. *See Burnison v. Memorial Hosp. Inc.,* 820 F.Supp. 549, 557 (D.Kan.1993).

**21.** If this Court had found the § 7(k) exemption applicable to these employees, the appropriate regulation would have been 29 C.F.R. § 553.222.

scheduled period."), *cert. denied*, 503 U.S. 1005, 112 S.Ct. 1761, 118 L.Ed.2d 424 (1992); *accord Burnison v. Memorial Hosp., Inc.*, No. 91–1072, 1992 WL 321608, at *8–10 (D.Kan. Oct. 7, 1992).

The two subsections of this regulation should be read together. Subpart (a) discusses eight hours only as a maximum period that may be designated as noncompensable for purposes of sleep. Although subpart (b) primarily explains when an entire night's sleep must be designated as working time, it also defines a reasonable night's sleep as five hours. Thus, Lexington County must demonstrate that its employees received at least five hours of uninterrupted sleep without a call to duty during a majority of time periods.

Lexington County has met his burden by establishing that during the months of March and June 1993, approximately 75% of the sleep periods were without interruption for the entire eight hours or for five hours, *i.e.*, 2:00 am to 7:00 am. *See* Plaintiffs' Exhibit 12. This Court finds that the employees had at least five hours of uninterrupted sleep during a majority of the time that had been allocated for this purpose.

 The employees also contend that they did not impliedly agree to exclude the sleep hours from their wages. An implied agreement to deduct sleep time from an employee's compensation clearly exists if the affected employee does not assert any verbal or written protest to the application of the exemption within a reasonable period of time of (1) the adoption of the policy or (2) the employee being hired under the policy. *See Bodie v. City of Columbia*, 934 F.2d 561 (4th Cir.1991); *Jacksonville Professional Fire Fighters Ass'n Local 2961 v. City of Jacksonville*, 685 F.Supp. 513, 520 n. 6 (E.D.N.C. 1987). If employees protest the policy but continue their employment subsequent to its adoption, their continued employment is evidence—but not necessarily conclusive—of their implied consent to its terms. *Rotondo v. City of Georgetown*, 869 F.Supp. 369, 374–

75 (D.S.C.1994). In such circumstances, it is imperative for the Court to examine the facts of each case in order to determine whether the employer has subjected its employees to economic duress. *See id.*[22]

Here, there is no evidence that any of the employees submitted reasonably prompt objections to this challenged policy through the established grievance process or complained to their supervisors about it. This lawsuit appears to have been the first indication to Lexington County that any of its employees were dissatisfied with its policy. Thus, this Court finds that the affected employees' failure to contest the policy within a reasonable period of time constitutes implied consent to the sleep period exemptions.

Finally, the Plaintiffs argue that their sleeping facilities that are housed in conjunction with a fire station are inadequate because they are awakened during their designated sleep periods by the noise from fire department vehicles responding to emergency calls. Although they produced anecdotal trial testimony that their sleeping patterns were disrupted, the Plaintiffs failed to produce any evidence of the frequency of these interruptions. They did not, for example, indicate how many such interruptions were inevitable because the ambulance had to respond to the same call soon after the fire department responded. Obviously speculation and conjecture would be inappropriate. Hence, this Court cannot conclude that the interruptions, though doubtlessly annoying, are sufficient to make the facilities inadequate. Accordingly, the requirements of § 785.22 have been satisfied, and the policy of Lexington County relating to sleep periods was proper.

### C.

 It should be noted that the Plaintiffs are entitled to be paid for the hours that their meal or sleep periods were interrupted by being placed on standby (*i.e.*, dispatched to a central location to handle two response areas). It is not disputed that this time

---

**22.** Although the cases discussed in this paragraph analyzed § 553.222 rather than § 785.22, these cases analyzed similar language that appears in § 785.22. Thus, these cases are persuasive regarding the requirements of an express or implied agreement to exempt sleep time from compensation in § 785.22.

would qualify as a compensable interruption in meal or sleep periods. However, the testimony established that the Plaintiffs were not always paid for this time. Thus, this Court determines that the Plaintiffs must be compensated for all standby time.

## VI.

■■■ Next, the Plaintiffs submit that they should have been paid "time and one-half" for their overtime work rather than on the basis of a fluctuating work week schedule. This Court agrees. The FLSA provides that an employee shall not be employed for more than forty hours in a given week unless he receives compensation for every hour worked in excess of forty "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). However, the courts have permitted the "fluctuating work week" as an alternative method of overtime compensation from the usual time and one-half overtime for those employees whose hours fluctuate if the requirements of 29 C.F.R. § 778.114 are met. *See Burgess*, 805 F.Supp. at 348. "Section 778.114 provides that a salaried employee whose hours of work fluctuate from week to week may reach a mutual understanding with his employer that he will receive a fixed amount as straight-time pay for whatever hours he is called upon to work in a workweek, whether few or many, and that he will be compensated for his overtime work at a rate of fifty percent of his regular hourly pay." *Condo v. Sysco Corp.*, 1 F.3d 599, 601 (7th Cir.1993), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994); *see also Spires v. Ben Hill County*, 745 F.Supp.

690, 702–04 (M.D.Ga.1990), *aff'd*, 980 F.2d 683 (11th Cir.1993). An employer is not required to show that the employee actually understood how to compute overtime. However, at a minimum, the employer must provide its employees with a reasonably clear and accurate explanation of their compensation. *See Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644, 648 (6th Cir.1986) (clear mutual understanding when employee signed explanatory calculation form for fluctuating work week method); *Condo*, 1 F.3d at 602 n. 4 (employment contract contained a chart illustrating the method of overtime pay).[23]

Although there was a mutual understanding between the parties that the Plaintiffs would work on salary, there was no similar agreement about their compensation for overtime work. According to Lexington County, the employees were told during the interview process that they would be paid a salary and "sometimes a little bit more." However, they were not told how the extra pay would be determined. Shortly after their initial date of employment, the employees were given a "Personnel Orientation" sheet, which indicated that their annual salary would be paid on a bi-weekly basis. *See* Defendant's Exhibit P. This "Personnel Orientation" sheet included a reference to overtime which stated: "Eligible ___ Not Eligible ___ (Salaried for all hours worked)" with the "Eligible" space marked. *Id.*[24] This sheet made no attempt to explain how the overtime would be calculated.

When the overtime policy was established, Lexington County sent a memorandum, dat-

**23.** The Plaintiffs initially argue that § 778.114 is not applicable because the workweek did not actually fluctuate. It is true that the shifts, on which all employees in this case worked, rotated on a regularly recurring cycle, so that an employee could determine (1) his schedule weeks or months in advance and (2) how many hours he would work during any chosen week. However, the fact that the cycle recurs does not mean that the hours do not fluctuate. The hours differed during the weeks within a cycle. Further, given that the Court has decided that sleep and meal periods were properly excluded during those times when the employees were not called to duty, the hours actually worked varied on almost every shift. Thus, the Court agrees with Lexing-

ton County and concludes that the workweek fluctuated for purposes of § 778.114.

**24.** Some of the forms, which were given to newly hired employees, made reference to overtime in the following manner: "Eligible (SALARIED FOR ALL HOURS WORKED)." *See, e.g.*, Defendant's Exhibit P–2. The phrase, "Salaried for all hours worked," apparently applied to all employees, irrespective of their eligibility for overtime compensation. However, an employee who received the form in Exhibit P–1 with the spaces marked could have reasonably assumed that the phrase, "Salaried for all hours worked" applied only to those persons who were ineligible for overtime.

ed June 17, 1985, to all of its employees which indicated that they would be paid according to a fluctuating pay plan. *See* Defendant's Exhibit Q. This memorandum advised the readers that "[O]vertime [would be] determined by dividing weekly salary by total hours worked and multiplying the overtime hours by 1½." As Lexington County conceded, the memorandum should have informed its employees that their overtime hours would be multiplied "by ½." Although this memorandum was incorrect, Lexington County never corrected the error. The Plaintiffs had a right to rely upon the material representations within their employer's memorandum and assume that they would be paid "time and one-half" for their overtime.

Lexington County also published a handbook which was made available for the employees to read at their substations. However, the handbook, in dealing with employee compensation issues, contained arguably contradictory language about whether the EMS employees would be paid on a fluctuating work week schedule. *See* Plaintiffs' Exhibit 3.[25] Even if this Court concluded that the employee handbook clearly explained the EMS workers' compensation, the Court could not conclude that a mutual understanding between the parties had been established. The only cases, of which this Court is aware, that have found a mutual understanding between the parties have done so when there was evidence that the employee had signed a document containing the information. *See Highlander*, 805 F.2d at 648 (form); *Condo*, 1 F.3d at 602 n. 4 (employment contract). For Lexington County to make a colorable argument, it must at least show that the employee received the information. Here,

there is no evidence that any of the Plaintiffs received, or were advised to read, the handbook. The record only reflects that copies were made available for the Plaintiffs to read at their substations. This evidence is not sufficient for Lexington County to meet its burden of proof on this issue.[26]

Accordingly, this Court concludes that Lexington County has not met the requirements of § 778.114, in that it has failed to demonstrate that there was a mutual understanding with its employees regarding overtime compensation issues. Accordingly, this Court determines that (1) Lexington County violated the FLSA when it paid the EMS employees on a fluctuating workweek method, and (2) the Plaintiffs are entitled to one and one-half times the regular rate of compensation for all time worked in excess of a forty hour work week.

## VII.

 Notwithstanding the violations of the FLSA that have been discussed above, Lexington County can establish a complete defense to liability if it acted "in good faith in conformity with and in reliance on ... any administrative practice or enforcement policy of [the Administrator of the Wage and Hour Division of the Department of Labor] with respect to the class of employers to which he belonged." 29 U.S.C. § 259 ("Portal-to-Portal Act"). This provision "was established essentially as an estoppel defense to protect employers from particular agencies' mistaken interpretations of particular statutory requirements; it does not come into effect until after there has been a failure to comply with the relevant statute due to an erroneous agency interpretation." *Cole v. Farm Fresh*

---

25. The Lexington County Employee Handbook states on page 19 that "EMS [employees] are paid a fixed salary for all hours worked in the pay period. Overtime for non-exempt employees is computed at one-half the hourly rate for the pay period when the number of hours worked exceeds the maximum hour standards for the work period (14 days)." However, on the previous page, the handbook provides, in part, "[w]ith the exception of Sheriff's Deputies, Fire Service, and EMS, regular full time employees are paid a fixed salary for a fluctuating work week." One reasonably could read these sentences as being contradictory about whether EMS employees were to be paid on a fluctuating workweek.

26. Lexington maintains that, even if the employees had not been correctly told how their overtime would be calculated, they could have or should have figured it out from their paychecks. However, the employees' paychecks only included the amount of their pay for regular earnings, as well as the amount of earned regular and overtime work. The paychecks do not explain the essential elements of overtime or include any type of a mathematical formula that would assist the wage earners with computing basic information about their overtime compensation.

*Poultry, Inc.*, 824 F.2d 923, 929 (11th Cir. 1987).

In an effort to establish his client's compliance with § 259, Gignilliat testified that he had represented five South Carolina counties in their negotiations with representatives of the Wage and Hour Division, including the South Carolina district director, to determine whether his clients' EMS programs were entitled to either the fire or law enforcement exemption of § 7(k).[27] Lexington County was not among those counties that he represented during these negotiations. Nevertheless, he opined that all EMS employees qualified for the law enforcement exemption because the Wage and Hour Division did not challenge the application of the § 7(k) exemption to all of the counties he represented. Upon careful review, the Court concludes that Gignilliat's testimony is insufficient to prove that Lexington County was in compliance with § 259.

Lexington County has failed to demonstrate the existence of an administrative practice or enforcement policy of the Administrator of the Wage and Hour Division on this issue. In order for a practice or policy to exist, the agency must adopt it through "some affirmative action." 29 C.F.R. § 790.18(h). There has been no proof by Lexington County that the Wage and Hour Division took any affirmative conduct, such as analyzing the type of dispatch calls, to determine whether any of the local EMS departments met the specific requirements of § 553.215. Although Gignilliat's testimony suggests that the South Carolina district office of the Wage and Hour Division generally concludes that EMS employees fall under the law enforcement exemption rather than the fire exemption, the evidence presented is in-

sufficient to establish an enforcement policy which would include Lexington County as being entitled to an exemption under § 7(k).

Assuming, *arguendo*, that Lexington County did establish the existence of an enforcement practice or policy, Lexington County has at most shown that it was a policy or practice of one district office. The statute, under which exceptions must be narrowly construed against the employer, *see Johnson*, 949 F.2d at 129–30, states that the policy or practice must be of "the agency," which is defined for purposes of the FLSA as "the Administrator of the Wage and Hour Division." *See* 29 U.S.C. § 259(b). Further, the regulations interpreting this statute state that "the agency" refers to "the persons ... who actually have the power to act as (rather than merely for)" the agency. *See* 29 C.F.R. § 790.19(b). In other words, the reference is to "the authority vested with the power to issue or adopt [a policy or practice] of a final nature ... as the official act or policy of the agency." *See* § 790.19(c). Thus, for example, an enforcement officer of the Wage and Hour Division cannot establish a practice or policy. *See* 29 C.F.R. § 790.18 (actions of field inspector in response to employee's complaint not sufficient).

This Court cannot conclude that the district director can act as the Wage and Hour Division and adopt policies or practices as the official act of the agency. In fact, no evidence has been presented as to the exact role of a director of a district office of the Wage and Hour Division. However, logic dictates that, in a federal agency with offices across the nation, if someone can act as (rather than simply for) the agency other than the administrator, it would be a top

---

27. The Plaintiffs objected to Gignilliat's testimony at trial, primarily arguing that it was inadmissible to show compliance by Lexington County with § 259 because (1) the policy or practice must be in writing and (2) his oral communications with representatives of the Wage and Hour Division were insufficient as a matter of law. The Court took this contested issue under advisement. Upon review, the Court overrules the objection. Some courts state that § 259 requires a writing. *See, e.g., Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923, 926 (11th Cir.1987). However, a close review of these cases indicates that the courts were *not* referring to an administrative

practice or enforcement policy. Section 259 requires good faith conformity with, and reliance upon, "any written administrative regulation, order, ruling, approval, or interpretation of the agency ... or any administrative practice or enforcement policy." The word "written" does not modify "administrative practice or enforcement policy." *See also* 29 C.F.R. 790.18 (listing examples of administrative practice or enforcement policy when Administrator "states" or "declares" practice or policy). Thus, it was not necessary that the practice or policy, which has been advanced by Lexington County, be in writing.

national official such as the deputy administrator of the agency, *see Hultgren v. County of Lancaster,* 913 F.2d 498, 507 (8th Cir.1990) (deputy administrator of the Wage and Hour Division), but not the director of a district office. This is especially true where, as here, Lexington County has failed to show that the national office had any impact in creating, or was even aware of, this alleged policy or practice. Therefore, Lexington County has failed to show that any policy or practice that it allegedly complied with was of the Administrator.

Even if an enforcement policy or practice of the Administrator did exist during all of the times that are relevant to this controversy, there is no evidence that Lexington County acted in reliance upon it.

For the reasons that have been stated above, the Court concludes that Lexington County has not satisfactorily demonstrated that § 259 is applicable under these facts.

## VIII.

■ The first consideration in determining damages is the applicability, if any, of the statute of limitations to any compensation to which the Plaintiffs may be entitled to receive. An employer is liable for three years in back wages if its FLSA violations were "willful" but only two years if they were not. 29 U.S.C. § 255(a). Ordinary violations, including those involving conduct that is "merely negligent," do not constitute "willful" violations. *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). It is only when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute" that the violations may be classified as "willful." *Id.*

■ The Plaintiffs claim that Lexington County's conduct was willful. This argument must be rejected. There is no evidence that Lexington County knew or showed reckless disregard for whether it was in compliance with the FLSA. This Court has already found that Lexington County acted in good faith by quickly attempting to comply with the FLSA after the *Garcia* deci-

sion. Although Lexington County should have continually reviewed its various methods of compensation over the years to assure its governing officials that the current pay plan complied with the FLSA as interpreted by the courts, this failure—at most—amounts to negligence. Therefore, the EMS employees are only entitled to back wages for a period of two years immediately prior to the filing of this action.

## IX.

■ The Court will now turn to the issue of liquidated damages. An employer who is not entitled to a defense under § 259 is liable for liquidated damages up to the amount of the employees' unpaid overtime compensation. 29 U.S.C. § 216(b). However, if the employer satisfactorily demonstrates that (1) its actions were made in good faith and (2) it had objectively reasonable grounds for believing that its conduct followed the dictates of the FLSA, then a court, in its discretion, may decide not to award liquidated damages. 29 U.S.C. § 260; *see also Nelson v. Alabama Inst. for the Deaf and Blind,* 896 F.Supp. 1108, 1115 (N.D.Ala.1995). "To satisfy the subjective good faith component, the [employer has the burden of proving] that [it] had an honest intention to ascertain what [the Act] requires and to act in accordance with it." *Nelson,* 896 F.Supp. at 1115 (internal quotation marks omitted; alteration in original).

■ The Court concludes that the Plaintiffs' application for liquidated damages should be denied. Lexington County acted immediately to ascertain and implement the requirements of *Garcia.* The undisputed testimony indicates that the Lexington County Administrator quickly called a meeting with Gignilliat and others in an effort to glean Lexington County's responsibilities under *Garcia.* In fact, the Lexington County policy went into effect prior to the expiration of the post-*Garcia* grace period that Congress had established. Although Lexington County did attempt to limit overtime pay when its policy was initially established, it did not adopt any provisions which, in the judgment of this Court, intentionally tested or exceeded the boundaries of the FLSA. In

fact, some of the portions of its policy were more generous than required by the FLSA, such as paying EMS employees for the entire eight-hour sleep period if they could not get five hours of consecutive sleep (rather than five hours of sleep in the aggregate). Therefore, the Court finds that Lexington County acted in good faith.

This Court also determines that Lexington County's position was objectively reasonable. Although the classification of EMS employees under the § 7(k) exemption for law enforcement activities was erroneous under these facts, Lexington County presented a strong, well-reasoned argument for its application. The Court also accepted Lexington County's arguments in many areas, such as in the applicability of the meal and sleep period exemptions. These arguments were clearly reasonable. Accordingly, the Court declines to award liquidated damages in this case.

## X.

Next, the Court concludes that the Plaintiffs are entitled to prejudgment interest. The general rule is that prejudgment interest is necessary, in the absence of liquidated damages, to offset the effect of wages or damages being wrongfully withheld and make the prevailing parties whole. *Dole v. Shenandoah Baptist Church,* 899 F.2d 1389, 1401 (4th Cir.1990); *Thomas v. County of Fairfax,* 758 F.Supp. 353, 368–69 (E.D.Va. 1991). This Court is aware of no compelling reason to depart from this well-established rule. As such, each Plaintiff is entitled to a judgment for (1) the amount of their overtime back pay for the two year period immediately preceding the commencement of this action and (2) prejudgment interest.[28]

If the parties do not consent to an alternative method of determining the total amount of compensation that is due to each of the Plaintiffs in this action within a period of fourteen (14) calendar days from the effective date of this Order and submit a written proposal to the Court within the above-listed

---

28. No evidence was presented as to the individual Plaintiffs' damages. At trial the Court granted a consent motion to bifurcate the question of the amount of damages from the remaining issues

time frame, this issue will be referred to a special master who will be directed to calculate the damages. *See* Fed.R.Civ.P. 53.

## XI.

Finally, the FLSA provides for an award of attorney's fees and costs to successful employees, stating, in part, that the Court "shall, in addition to any judgment awarded to the ... plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). Hence, the Plaintiffs, as prevailing parties, are entitled to receive a reasonable attorney's fee and costs. In the absence of an agreement between the Plaintiffs and Lexington County within a period of fourteen (14) calendar days from the effective date of this Order, the issue of attorney's fees will be resolved by the Court or, in the alternative, transmitted to a special master with the directive to determine the amount of attorney's fees to which the Plaintiffs are entitled to receive in this case. *See* Fed.R.Civ.P. 53.

IT IS SO ORDERED.

because of the complexity of computing back pay and other damages due each Plaintiff, many of whom were not employed by Lexington County during the entire period in dispute.