**John D. TROCHECK, et al., Plaintiffs,**

v.

**PELLIN EMERGENCY MEDICAL SERVICE, INC., et al., Defendants.**

**No. 4:98–CV–161.**

United States District Court, N.D. Ohio, Eastern Division.

June 30, 1999.

Ira J. Mirkin, Richard T. Bush, Green, Haines, Sgambati, Murphy & Macala, Youngstown, OH, for John D. Trocheck, Martin Shaffer, plaintiffs.

David Cooper Comstock, Jr., Comstock, Springer & Wilson, Youngstown, OH, James P. Wilkins, Steven C. Sutton, Millisor & Nobil, Cleveland, OH, John C. Grundy, Warren, OH, for Pellin Emergency Medical Service, Inc., Richard Pellin, Sr., Vanessa Pellin, defendants.

## MEMORANDUM & ORDER

O'MALLEY, District Judge.

Plaintiff John Trocheck brings this action against his ex-employer, Pellin Emergency Medical Service, Inc., and its owners, Richard and Vanessa Pellin (collectively, "Pellin"). Trocheck claims Pellin failed to pay him about $12,000 in overtime compensation, in violation of both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and also the Ohio statutory analog of FLSA, Ohio Rev.Code § 4113.03.

Currently pending are Pellin's motion for summary judgment (docket no. 36) and Trocheck's cross-motion for summary judgment on the issue of liability (docket no. 47). For the reasons stated below,

Pellin's motion is **GRANTED,** Trocheck's motion is **DENIED,** and this case is **DISMISSED.**

## I.

Except where noted, the following facts are not in dispute. Pellin operates an ambulance service out of four different stations, located in four different Ohio cities: Ellsworth, North Jackson, Youngstown, and Boardman. Pellin hired Trocheck as a paramedic in July of 1995, and Trocheck worked at the Youngstown station about 80% of the time. Trocheck's duties were to ride in the back of the ambulance, tending to patients. Trocheck did not drive the ambulance except on rare occasions.[1] Ambulance dispatches often required driving on interstate highways, and sometimes involved crossing into Pennsylvania or visiting nearby airports.

Trocheck's shift was 24 hours long, and started either at 7:00, 8:00, or 9:00 in the morning. Pellin, knowing its employees spent an entire day continuously on duty, provided its employees with living and sleeping quarters at the station. In all the stations, for example, the living quarters included kitchen facilities (microwave, refrigerator, sink, stove or hot plate, etc.), couches, cable television, VCR, a bathroom and shower, and heat and air conditioning. The sleeping quarters were made up of separate bedrooms, generally one bed to a room, with dressers, lamps, nightstands, and fresh linens.[2] The entrances to the bedroom areas did not have doors on them, in order to facilitate quick exits by sleeping employees when an emergency was called in, but the bedrooms were relatively private. For example, it was difficult, at best, to see into a bedroom from the living area, and employees did not enter the bedroom area unless they were going to sleep.

Trocheck, like the other Pellin employees, was generally required to remain at the station during his shift. While not actually engaged in a dispatch, Trocheck was allowed to pass the time as he wished—reading, watching TV or videotapes, making personal telephone calls, playing cards, wrestling with other employees, even having visitors or going out to dinner.[3] After 6:00 p.m., Trocheck was allowed to obtain whatever sleep he could; however, he remained "on-call" in case of any need for an ambulance dispatch. Pellin would signal the necessity for a dispatch over a speaker with a loud tone, followed by an announcement by a dispatcher of the location of the emergency. In the Youngstown station, the dispatcher would also announce which of the two ambulance crews on duty had to respond. The ambulance crew was expected to be en route to the emergency within two minutes of receiving the dispatch announcement. In addition to emergency dispatch announcements, Pellin would also use this system to direct ambulance crews to "stand post." To "stand post" meant to

---

1. Of the many hundreds of ambulance dispatches worked by Trocheck, he drove on only two—one where the other employee with whom he was paired had his driver's license suspended, and one where the other employee knew the patient and wanted to visit in the back of the ambulance.

2. The North Jackson and Boardman stations had two separate bedrooms, one for each employee on duty. The Youngstown station had one large room with two beds in it, and also two smaller, separate bedrooms. Occasionally, an employee at the Youngstown station would need to walk from the living area through the one large bedroom to answer the door; otherwise, the bedrooms were relatively private. The Ellsworth station did not have sleeping quarters because employees working there did not work 24–hour shifts.

3. There is evidence that the employees at the Youngstown station would occasionally engage in wrestling matches on the bed mattresses, although it is unclear whether Trocheck did so. Employees were allowed to go out to dinner while on call, but apparently did not do so frequently because of the likelihood they would be called away for a dispatch. Trocheck states that he also sometimes slept during hours outside of the sleeping period (e.g., between the time he started his shift and 6:00 p.m.).

leave the station and wait at another, more central location while the ambulance crew from another station was on dispatch.

During Trocheck's initial orientation, which occurred just after Pellin hired him, Pellin showed Trocheck the actual sleeping quarters in each station and explained in general terms its compensation and sleeping policy. Trocheck learned that he was permitted to obtain whatever sleep he could during a "sleeping period" that lasted from 6:00 p.m. to the end of his shift the next morning.[4] Regarding compensation, Trocheck learned that Pellin paid him on an hourly basis.[5] Pellin's policy was that, even if there were no ambulance dispatches at all during the sleeping period, so that Trocheck could sleep as much as he wanted during this time, Pellin still paid Trocheck for 20 of the 24 hours of his shift. The only exception to this policy was that, if various ambulance dispatches occurred such that Trocheck was unable to obtain a total of at least 5 hours of sleep during the sleeping period, then Pellin paid Trocheck for all 24 hours of his shift. Trocheck does not dispute that he understood and acquiesced to this policy. Indeed, each one of Trocheck's biweekly paychecks revealed that Pellin was not paying him for all 24 hours of his work shifts. Trocheck regularly checked his paychecks for accuracy and never questioned or complained about Pellin's compensation policy or practices before this lawsuit.[6]

Obviously, there were many spans of time during the sleeping period that Trocheck could not actually sleep. Primarily, Trocheck could not sleep any time during which he was engaged in an ambulance dispatch or when he had to stand post. Pellin documented when these dispatches occurred and how long they lasted.[7] It is also undisputed that Trocheck was not able to sleep during the following spans of time: (1) while in Youngstown, he had to wake to listen to all announcements from the dispatcher, even if it was the other crew that was dispatched; (2) while in Youngstown, he often woke when the other crew returned to the station; (3) while in Youngstown, he often woke when workers from Chance Brothers Waterproofing—who shared the Youngstown garage—arrived for and returned from work in their trucks; (4) while in any station, after returning from a dispatch, he could not return to sleep until the ambulance was parked and restocked and he had again gotten ready for bed; and (5) while in any station (but especially Youngstown), noise made by his co-employees sometimes kept him awake.[8] Pellin's logs do not document

---

4. Trocheck's "sleeping period," then, was either 13, 14, or 15 hours long, depending on whether his shift ended at 7:00, 8:00, or 9:00 in the morning.

5. At the time he was hired, Trocheck received $8.00 an hour for "regular time" and $12.00 an hour for overtime; later, he received $8.25 an hour for "regular time" and $12.37 for overtime.

6. The absence of a complaint by Trocheck during his employment tenure about Pellin's sleeping and compensation policy, or the adequacy of Pellin's sleeping quarters, cannot be attributed to shyness. Trocheck did complain to Pellin, for example, about the cleanliness of the stations generally and also about the quality of the drinking water and the heating at the North Jackson station. He also complained to Pellin, at least once, about not receiving credit for a number of overtime hours he had worked; Pellin promptly corrected this mistake.

7. Trocheck relies on Pellin's dispatch logs to provide the following example of the frequency of ambulance dispatches on which he served as a crew-member: in 1996 and 1997, he worked a total of 187 24-hour shifts; during the first 8 hours of his sleeping period on these shifts (i.e., from 6:00 p.m. through 2:00 a.m.), he served on 630 dispatches, thus averaging 3.4 dispatches per the first 8 hours of his sleeping period.

8. Trocheck testified that he had "no trouble" sleeping at the North Jackson station (nicknamed the "vacation station" by the employees), but that he preferred the Youngstown station because it had more action. The Youngstown station was noisier, both because it housed two ambulance crews and because it got more dispatches.

when or how long any of these time spans occurred.

Toward the end of Trocheck's tenure at Pellin, the Department of Labor ("DOL") audited Pellin's compensation policies and practices in response to a complaint by another employee. During this audit, the DOL interviewed Trocheck for about an hour. Trocheck was more familiar with state and federal labor requirements than the average Pellin employee, because he owned and operated two coffee and bakery shops.[9] The DOL concluded that Pellin's overtime, sleep-time, and other compensation policies and practices complied with FLSA.[10]

Trocheck ceased working for Pellin in October of 1987. During his tenure with Pellin, Pellin paid Trocheck according to its compensation policy: 20 hours' wages for each 24–hour shift, unless ambulance dispatches (or standing post) prevented him from obtaining a total of 5 hours of sleep during the sleeping period, in which case Pellin paid wages for all 24 hours. Although Trocheck never complained about this policy or his compensation at the time, even after meeting with the DOL auditor, he now asserts that Pellin's failure to pay him wages for all 24 hours for *every* shift he worked was a violation of FLSA and Ohio statute. Pellin seeks unpaid compensation of about $12,000, plus liquidated damages, costs, and attorney fees.

## II.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ....

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein .... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is

---

9. Trocheck owned these bakery and coffee shops as the sole proprietor, and employed about eight people.

10. Pellin does not argue, and the Court can find no authority for the proposition, that the DOL auditor's conclusions moot this action or provide a defense to Pellin against Trocheck's claims of non-willful FLSA violations.

"material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

### III.

#### A. *Applicability of the Motor Carrier Act Exemption.*

FLSA provides that "no employer shall employ any of his employees who in any workweek is engaged in commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Trocheck asserts that Pellin violated this provision by not paying him "time and a half" for each and every hour he worked in excess of 40 per week—that is, for the four hours per shift he did not get paid.

Pellin raises several defenses, the first of which is that § 207(a)(1) does not apply to Trocheck because he falls within the "Motor Carrier Act exemption." This exemption is contained within FLSA itself: the statute provides that the overtime provision contained in § 207(a)(1) does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [section 204 of the Motor Carrier Act], section 31502 of Title 49." 29 U.S.C. § 213(b)(1). The Court concludes, however, that this defense is unavailing—Trocheck does not fall within the Motor Carrier Act exemption.

It is true, as Pellin notes, that the Sixth Circuit Court of Appeals has ruled that at least certain types of employees of ambulance services *may* fall within the Motor Carrier Act exemption. *See Benson v. Universal Ambulance Service, Inc.*, 675 F.2d 783, 786–87 (6th Cir.1982) (holding that a *driver* of an ambulance clearly fell within the exemption, and remanding for determination of whether an ambulance attendant or dispatcher did so). The appellate court's determination, however, came before the Federal Highway Administration, Department of Transportation promulgated the regulation codified at 49 C.F.R. § 390.3(f)(4) (1998). This regulation states that the Motor Carrier Act does not apply to employers engaged in "[t]he transportation of human corpses or sick and injured persons." Clearly, the Department of Transportation would not exercise jurisdiction over Pellin.

Reasonable agency interpretations of laws and regulations enforced by that agency are entitled to deference by the

courts. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 862–65, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Sharondale Corp. v. Ross,* 42 F.3d 993, 998 (6th Cir.1994). Unlike the *Benson* court, which was not presented with any applicable regulation, this Court must defer to 49 C.F.R. § 390.3(f)(4). Moreover, it is notable that other courts have since relied on this regulation to conclude that "Congress did not intend the jurisdiction of the Motor Carrier Act to extend to the provision of transportation for ambulance services." *Spires v. Ben Hill County,* 980 F.2d 683, 687 (11th Cir.1993); *see Jones v. Giles,* 741 F.2d 245, 250 (9th Cir.1984) ("we hold that ambulance services are not subject to the Motor Carriers Act, and are therefore subject to the FLSA"); *Bayles v. American Medical Response of Colorado, Inc.,* 937 F.Supp. 1477, 1484 (D.Colo.1996) (holding that the regulation exempting transportation of human corpses or sick and injured persons from coverage under the Motor Carrier Act (MCA) exempted an ambulance service from all requirements of the MCA, so that an ambulance service was subject to FLSA and did not fall within the "motor carrier exemption"); *Smith v. F–M Ambulance Service, Inc.,* 914 F.Supp. 359, 362 (D.N.D. 1995) ("ambulance services are not subject to the Department of Transportation's jurisdiction under the Motor Carrier Act. Therefore, because F–M Ambulance is not entitled to an exemption under 29 U.S.C. § 213(b)(1), it is subject to the provisions of the FLSA, including overtime compensation").

Accordingly, the Court concludes that Trocheck does not fall within the Motor Carrier Act exemption. Thus, the FLSA regulations do apply to Trocheck.

### B. FLSA Requirements.

Having determined that Trocheck is not exempt from the requirements of FLSA, the Court must determine whether Pellin complied with the relevant provisions. With respect to payment of employees who work 24–hour shifts, Pellin is required to comply with FLSA regulation 29 C.F.R. § 785.22. This regulation states:

(a) *General.* Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.

(b) *Interruptions of sleep.* If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

29 C.F.R. § 785.22 (parenthetical case citations omitted). Trocheck argues that Pellin did not comply with this regulation because: (1) he and Pellin did not expressly or impliedly "agree to exclude ... a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked;" (2) the sleeping facilities provided to him by Pellin were not "adequate;" and/or (3) he did not "usually enjoy an uninterrupted night's sleep." The Court examines each of these assertions below.

### 1. The Agreement Between Trocheck and Pellin.

█ As the regulation makes clear, Trocheck and Pellin may enter into an "expressed *or* implied agreement" to exclude a "regularly scheduled sleeping period of

not more than 8 hours from hours worked." 29 C.F.R. § 785.22(a). It is undisputed that the parties did not enter into an *express* agreement that Pellin would receive no pay during a sleeping period within his 24–hour shift. Pellin argues, however, that they entered into an *implied* agreement that Trocheck would not receive pay for four hours of sleep-time every 24–hour shift, unless Trocheck could not get five hours of sleep during his sleeping period. The Court agrees.

Although Trocheck cannot recall the exact content of the explanations he received during his initial orientation, Trocheck does not dispute Pellin's assertion that it explained to him its compensation and sleep policies. Essentially, it is undisputed (and entirely believable) that Trocheck knew how he would be compensated before he began work, knew he was allowed to sleep while on duty, and knew he would not be paid for every hour of the 24–hour shifts he worked. It is also undisputed that, every two weeks, Trocheck received a document—his paycheck—evidencing that he was not paid for every hour he had been on duty. Finally, it is undisputed that Trocheck often checked the accuracy of his paycheck and never complained about non-compensation for sleep-time, nor did he refuse to work a 24–hour shift based on a perceived compensation inequity.[11]

■ Given these undisputed facts, a reasonable finder of fact could only conclude that Trocheck "understood and acquiesced to [Pellin's compensation and sleep] policy" when he was hired. *Braziel v. Tobosa Developmental Services*, 166 F.3d 1061, 1063 (10th Cir.1999) (finding the employer and employees entered into an implied agreement that sleep time would be exempted from paid work). "An implied agreement to deduct sleep time from an employee's compensation clearly exists if the affected employee does not assert any

verbal or written protest to the application of the exemption within a reasonable period of time of (1) the adoption of the policy or (2) the employee being hired under the policy." *Roy v. County of Lexington, S.C.*, 928 F.Supp. 1406, 1418 (D.S.C.1996), *vacated in non-relevant part*, 948 F.Supp. 529 (D.S.C.1996), *affirmed*, 141 F.3d 533 (4th Cir.1998). An employee's protest does not need to rise to the level of voluntary termination of employment to avoid implication of an agreement: "employees do not necessarily have to quit their jobs or refuse their paychecks to object effectively to the employer's exclusion of sleep and meal periods for the purposes of overtime." *Harrison v. City of Clarksville, Tenn.*, 732 F.Supp. 810, 814 (M.D.Tenn. 1990). "At the very least, [however,] to negate the inference of agreement to the exclusion, the employee must expressly object within a short period after learning of the employer's intent to exclude the time." *Id.* Trocheck never lodged any such objection.

Furthermore, the existence of an implied agreement in this case is proved not only by what Trocheck did *not* do—complain about Pellin's policies—but by what he *did* do—cash his paychecks and continue to work for Pellin. *See Johnson v. City of Columbia, S.C.*, 949 F.2d 127, 131 (4th Cir.1991) ("If the employee contemporaneously protested, the courts have found that there was no implied agreement between the parties. However, if the employee did not protest and continued to work and receive paychecks, the courts have found that an implied agreement did arise between the parties") (citations omitted); *Bodie v. City of Columbia, S.C.*, 934 F.2d 561, 563–66 (4th Cir.1991) (holding that the plaintiff firefighter's continued employment, receipt of pay checks, and failure to protest the city's overtime policies created an implied contract). By repeatedly acquiescing to Pellin's calculation of his

11. Indeed, Trocheck did not complain about his compensation even after meeting with the auditor from the DOL Wage and Hour Division, who investigated whether Pellin's policies complied with FLSA.

hours worked, Trocheck impliedly agreed that Pellin's compensation and sleep policies governed their employment relationship.

Put simply, the undisputed facts in this case reveal that an agreement between Trocheck and Pellin must be implied from the course of conduct of the parties, as a matter of law. Trocheck impliedly agreed that he would be compensated for 20 hours of each 24–hour shift, unless his duties prevented him from obtaining 5 hours of sleep during the sleeping period, in which case he would be paid wages for 24 hours. Trocheck cannot show Pellin violated FLSA by relying on the absence of an agreement regarding overtime compensation.[12]

### 2. The Adequacy of the Sleeping Facilities.

■ Having concluded that Trocheck impliedly agreed that Pellin could compensate him for less than all of his on-duty hours, the question remains whether Pellin enforced this agreement in compliance with FLSA regulations. Under 29 C.F.R. § 785.22(a), "an employer and employee may agree to exclude up to eight hours sleep time in a 24–hour shift '*provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's*

sleep.'" Hultgren v. County of Lancaster, 753 F.Supp. 809, 826 (D.Neb.1990), *affirmed in part and reversed in part,* 913 F.2d 498 (8th Cir.1990) (emphasis added) (quoting 29 C.F.R. § 785.22(a)). Trocheck asserts that even if he impliedly agreed to Pellin's compensation and sleeping policies, Pellin still violated FLSA by not providing him with "adequate sleeping facilities." [13]

The regulation itself does not define or describe what makes sleeping facilities "adequate." Of course, what one person may find adequate, another might not. See Beaston v. Scotland School For Veterans' Children, 693 F.Supp. 234, 238 (M.D.Pa.1988), *affirmed,* 869 F.2d 587 (3rd Cir.1989) ("[t]he variations in testimony reveal the personal factors involved in an inquiry into the adequacy of sleeping facilities"). This variation among persons, however, does not automatically make the question of adequacy one that is not susceptible to summary judgment analysis. If the facts are undisputed that *the plaintiff, himself,* actually found the facilities provided to be adequate, then summary judgment is appropriate.[14]

Generally, it is fair to conclude that a sleeping facility is "adequate" if it provides a "favorable environment that would enable sleep to occur and provide[s] reasonable assurance that [the employee] will be

12. Furthermore, even if the undisputed facts showed that Pellin *never* explained its compensation and sleep policies to Trocheck before hiring him—as Trocheck seems to suggest in his briefs, despite his deposition testimony that he could not recall the exact contents of Pellin's orientation explanations—the result would probably be the same. See Harrison v. City of Clarksville, 732 F.Supp. 810, 815 (M.D.Tenn.1990) (citations omitted) ("New hires have an opportunity before accepting employment to discover the terms of employment that are material to their decisions whether to take their jobs. Failure to discuss a particular term before accepting a position indicates either that the term was not material to the decision to accept the job, or that the term, though material, was simply overlooked. Where the parties discover the oversight shortly after hire, and

the employee decides to continue in his employment and to accept his paycheck, the employee's actions manifest his acceptance of the originally overlooked term, even though he expresses his objection to the term.").

13. Trocheck's argument that he was not provided with "adequate" sleeping facilities cites no law, and is only two sentences long. Motion at 24. Although the Court addresses this assertion on the merits, below, the Court also concludes that Trocheck's meager argument completely fails to carry his burden of proof.

14. The Court further believes, but does not actually hold, that summary judgment would also be appropriate if the "average person" would have found the sleeping facilities "adequate."

rested and alert when [his] duty time begins." 54 Fed.Reg. 41709–02, 1989 WL 293362 (F.R.) (Oct. 11, 1989) (discussing the adequacy of sleeping facilities on airplanes for flight crew members). In the context of this specific case, furthermore, the most telling indicator of whether the sleeping facilities were adequate is whether Trocheck ever indicated in any way that they were not. *See Beaston,* 693 F.Supp. at 238 ("There is no doubt that the houseparents' sleep is temporarily disturbed on occasion. However, upon consideration of all of the evidence, the court is unable to conclude that the plaintiffs are furnished inadequate sleeping facilities or that they are unable to get normal rest. The noises they complain of are not unlike those in many homes in many communities. *The court puts substantial weight on the fact that the Scotland School Administration has received few complaints about nighttime interruptions* ") (emphasis added).

In this case, it is undisputed that Trocheck never complained about the adequacy of his sleeping facilities to Pellin; the first time he asserted inadequacy was in this lawsuit. And even now, Trocheck makes absolutely no suggestion that he could not, in fact, fall and stay asleep for some period of time in the facilities provided. Trocheck may have preferred sleeping quarters that were more private and more silent, but the regulation contains "no requirement that [Pellin] furnish personal quarters," *Spellman v. VisionQuest Nat'l, Ltd.,* 1988 U.S. Dist. LEXIS 4298 at *12 (W.D.Pa. Feb. 13, 1998), nor that the sleeping facility be free from all distracting noise, *Beaston,* 693 F.Supp. at 238.

Further, the question of adequacy must be determined in the context of what FLSA and its regulations seek to accomplish. The FLSA regulation at issue is clearly *not* designed to ensure employees are well-rested—five hours of sleep, even if consecutive, does not usually leave a person fully refreshed. Rather, the regulation is meant to strike a fair balance between a 24–hour shift employee's desire to be compensated for all hours spent on the job, and the employer's desire to avoid paying employees for hours spent sleeping. *See generally* 29 U.S.C. § 202 (setting out the policies behind FLSA). The regulation sets forth the "fair balance:" put simply, the employer can avoid paying the employee for no more than 8 hours spent actually sleeping, and if the employee doesn't get a total of 5 hours of sleep, the employer must pay the employee for *all* hours worked. Similarly, an assessment of the adequacy of the sleeping facilities must strike a fair balance between the employee's desire for a quiet and private sleep chamber, and the employer's need to take into account the realities and demands of the job—including the need to house employees on site and to assure that they remain quickly available for duty. Thus, just as it would be impractical to provide large, private bedrooms to flight crews while in the air, it would be unrealistic to shield emergency personnel from all station-house interruptions without also risking delays in employee response time. "Adequate" sleeping facilities may thus require more than a chair in a corner of an office, but may also be less than a home-like atmosphere.

The Court need not determine precisely where, within this broad range, the fair balance of adequacy falls; it is sufficient to conclude that the undisputed facts in this case show the sleeping quarters provided by Pellin are not so spartan or lacking in privacy that they are inadequate. The Court's overwhelming impression is that the sleeping quarters provided by Pellin to Trocheck and the other employees were no less adequate than the sleeping facilities enjoyed by the average college dormitory student, and substantially better than those enjoyed by most of the medical residents to whom Trocheck delivered patients. Trocheck knew what his sleeping facilities would be like when he was hired, and he never complained about them then or thereafter. Given this lack of complaint, a reasonable finder of fact could

only conclude that Trocheck found the sleeping quarters provided to him by Pellin were "adequate." Thus, as a matter of law, Trocheck cannot avoid the force of his implied agreement by showing Pellin violated FLSA regulations regarding the adequacy of sleeping facilities.

### 3. Sleep Interruptions.

■ For the implied agreement between Pellin and Trocheck to meet the regulatory requirements, not only did Pellin have to provide "adequate sleeping facilities," but circumstances had to be such that Trocheck "usually enjoy[ed] an uninterrupted night's sleep." 29 C.F.R. § 785.22(a). Unlike the regulation's silence on what makes a sleeping facility "adequate," the regulation does define when a night's sleep is "uninterrupted." The regulation defines "uninterrupted" as meaning "that if the employee cannot get at least 5 hours' sleep during the scheduled period[, then] the entire time is working time." Furthermore, "the required five hours' sleep need not be consecutive hours." *Bouchard v. Regional Governing Bd. of Region V Mental Retardation Services,* 939 F.2d 1323, 1332 (8th Cir.1991), *cert. denied,* 503 U.S. 1005, 112 S.Ct. 1761, 118 L.Ed.2d 424 (1992).[15] Thus, so long as the employee is "usually" able to enjoy a total of five hours of sleep during the sleeping period, Pellin meets the regulation's requirement.

■ Trocheck asserts that he did not usually obtain five hours of sleep during the sleeping period. To prove this, however, Trocheck relies on skewed statistics and an incorrect interpretation of the regulation. First, Trocheck insists that, even though he was allowed to sleep anytime between 6:00 p.m. and the end of his shift, only the first eight hours of this time can be counted as the "sleeping period" within which he did not usually obtain five hours of sleep.[16] The basis for this position is the following language in the regulation: "the employer and the employee may agree to exclude ... a bona fide regularly scheduled sleeping period *of not more than 8 hours* from hours worked." 29 C.F.R. § 785.22(a) (emphasis added). Trocheck asserts that this language means that the regularly scheduled sleeping period during which an employee is allowed to sleep, when working a 24–hour shift, can only be 8 hours long. Trocheck ignores, however, the next sentence in the regulation: *"[i]f sleeping period is of more than 8 hours, only 8 hours will be credited." Id.* (emphasis added). The only meaning this sentence can possibly have is that the regularly scheduled sleeping period may be longer than 8 hours. Read together, these sentences state that an employee and employer may agree that: (1) the employee will have a regularly scheduled sleeping period of *any* length; (2) the employee will not receive pay for this sleeping period, so long as he usually is able to obtain five hours of sleep within the period; and (3) the number of hours the employee will not be paid cannot exceed 8, even if the sleeping period is longer. Pellin actually ex-

15. *See also Bouchard,* 939 F.2d at 1332 ("[t]he 5 hours of sleep need not be 5 continuous uninterrupted hours of sleep. However, if interruptions during the sleep period are so frequent as to prevent reasonable periods of sleep totaling at least 5 hours, the entire period would be considered hours worked") (citing *Department of Labor, Wage & Hour Division Publication 1459,* State and Local Government Employees Under the Fair Labor Standards Act (May 1985)); *Roy v. County of Lexington, S.C.,* 141 F.3d 533, 546 (4th Cir.1998) (same, citing *Bouchard*); *Department of Labor, Wage & Hour Division, Field Operations Handbook* § 31b12(b) (Sept. 19, 1996) ("a reasonable night's sleep means that an employee obtains at least five hours of sleep during the scheduled period. These five hours need not be continuous uninterrupted hours of sleep. However, if interruptions are so frequent as to prevent reasonable periods of sleep totaling not less than five hours, the entire period would be considered hours worked").

16. Trocheck states that, during the first 8 hours of his sleeping period, he suffered *no* interruptions at all only 2% of the time, and he was interrupted such that he was unable to obtain 5 total hours of sleep 69% of the time.

ceeded this last requirement—while the regulation permitted Pellin to agree with Trocheck that it would not pay him for 8 hours of his sleeping period, Pellin excluded only 4 hours of his sleeping period from compensated time.

Trocheck argues that to allow Pellin to designate a regularly scheduled sleeping period of more than 8 hours would actually allow Pellin to designate the entire 24-hour shift as a "sleeping period." Pellin could then avoid the regulation so long as Trocheck usually obtained 5 hours of sleep during the entire day. The response to this argument is two-fold: (1) the regulation requires that the regularly scheduled sleeping period must be "bona fide," and Trocheck does not assert Pellin engaged in any sham;[17] and (2) even if Pellin did designate the entire 24-hour shift as a sleeping period, it could still only agree not to pay Trocheck for, at most, 8 of those hours. In other words, Pellin cannot avoid the regulation at all.

■ As a corollary argument attacking Pellin's designation of a sleeping period lasting 13 to 15 hours, Trocheck asserts that the sleeping period was not "regularly scheduled." Trocheck gives the example that he might have slept on one night from 8:00 –11:00 p.m. and 4:00–6:00 a.m. (totaling 5 hours), but slept on the next night from 10:30–11:30 p.m., 12:30–2:30 a.m., and 5:30–7:30 a.m. (again totaling 5 hours). Trocheck argues that this example shows he was unable to obtain sleep according to any regular schedule. The example only shows, however, that Trocheck did not have regularly scheduled sleep *during his sleeping period;* the sleeping period, itself, was regularly scheduled, beginning every day at 6:00 p.m. and ending with Trocheck's shift. Trocheck is unable to show Pellin met the regulation's requirement that the sleeping period must be regularly scheduled.

Trocheck next argues that "an uninterrupted night's sleep" means 8 hours of continuous sleep. As noted above (see footnote 15), the DOL and many courts define this phrase quite differently, stating that an uninterrupted night's sleep occurs whenever the employee obtains a total of 5 hours of non-continuous sleep, unless the interruptions are unreasonably frequent. Trocheck must present the Court with good reason to ignore the DOL's interpretation of its own regulations. *Ross,* 42 F.3d at 998; *see Burnison v. Memorial Hosp., Inc.,* 1992 WL 321608 at *9 (D.Kan. Oct.7, 1992) (adopting the "5 hour definition" of an uninterrupted night's sleep on the basis that "the Department's interpretation of its own regulation is reasonable on its face and is entitled to deference by the court").

In support of his position that "an uninterrupted night's sleep" means 8 hours of continuous sleep, Trocheck cites three cases: *Armour & Co. v. Wantock,* 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944), *Central Missouri Tel. Co. v. Conwell,* 170 F.2d 641 (8th Cir.1948), and *Lowe v. Bell House, Inc.,* 74 N.C.App. 196, 328 S.E.2d 301 (1985). The first two of these cases, however, were decided long before the DOL promulgated 29 C.F.R. § 785.22. Further, in both *Lowe* and *Wantock* there was no agreement between the employer and employee, taking the cases outside of the ambit of the regulation. And in *Conwell,* the employee did not even work a 24-hour shift. Simply, these three cases do not persuade the Court that the DOL regulation's phrase "an uninterrupted night's sleep" should mean 8 hours of continuous sleep, instead of what the DOL says the phrase should mean.[18] Indeed, Trocheck's

17. Trocheck does not dispute, for example, that he was relieved of all duties during the sleeping period except when he received an ambulance dispatch call.

18. Similarly, *Benson v. Universal Ambulance Service, Inc.,* 675 F.2d 783 (6th Cir.1982) and

*Ariens v. Olin Mathieson Chem. Corp.,* 382 F.2d 192 (6th Cir.1967)—cases Trocheck cites elsewhere in his briefs—do not support the proposition that an "uninterrupted night's sleep" means 8 hours of uninterrupted sleep. Further, *Benson* is inapposite because there

proposed definition would require employers to ensure that those employees who work 24–hour shifts will obtain what this Court would find a rare and luxurious night's sleep.[19]

Trocheck's next effort to show he did not usually enjoy an uninterrupted night's sleep focuses on Pellin's definition and assessment of "interruptions." Trocheck asserts that the measure of "interruptions" should include not only the periods of time that he was sent on ambulance dispatch during the sleeping period, but also all the other sleep disruptions he suffered—including waking to listen to the dispatcher's announcements for the other crew, waking when the other crew returned to the station, waking when workers from Chance Brothers Waterproofing moved their trucks, waking when co-employees made noise socializing, and so on. The Court must disagree, except in small part.

The regulation states that "[i]f the sleeping period is interrupted *by a call to duty*, the interruption must be counted as hours worked." 29 C.F.R. § 785.22(b). Most of the sleep disruptions that Trocheck insists should have been, but were not, counted as "interruptions" were not caused by calls to duty. Certainly, sleep disruptions caused by card-playing coworkers or neighboring workmen are not attributable to calls to duty. The Court does agree that Pellin's measurement of interruptions during the sleeping period should include time Trocheck spent parking and restocking the ambulance after returning from an emergency dispatch, and also time he spent waking to listen to all dispatch announcements. These are fairly regarded as duty-related interruptions. But the amount of time caused by these interruptions was de minimis. Trocheck stated he normally spent about 10–15 minutes on work-related duties after the ambulance returned to the station. Interruptions caused by waking to listen to dispatch announcements for the other crew lasted less than 5 minutes each.

Using its own measurement of sleep interruptions, Pellin offers evidence that Trocheck obtained at least 5 hours of sleep during his sleeping period on over 95% of his 24–hour shifts.[20] There is no question that this falls within the definition of "usually enjoying an uninterrupted night's sleep," when measured against FLSA's interpretation of its own regulation. *See Roy*, 141 F.3d at 546 (holding that employees who got 5 or more hours of sleep during 65% of their 24–hour shifts usually enjoyed an uninterrupted night's sleep). The Court agrees with Trocheck that Pellin should have included other sleep interruptions in its measurements. But Trocheck makes absolutely no showing that accounting for these relatively minor additional amounts of interruption time has the effect of decreasing the number of shifts where he obtained 5 hours of sleep during his sleeping period from over 95% to less

was no implied agreement to include or exclude sleep time, 675 F.2d at 787, and *Ariens* pre-dated the DOL's interpretations of its own regulation.

19. The Court understands that, while eight hours of continuous sleep is a luxury, it is also true that an employee who obtains only five hours of non-continuous sleep during the course of a 24–hour shift will almost certainly be tired. As noted above, however, the regulation is not designed to ensure employees are well-rested. Thus, it is not unreasonable for the definition of "an uninterrupted night's sleep," in the context of FLSA, to be different than the definition used in everyday discourse.

20. Specifically, Pellin shows that Trocheck was in the station during the sleeping period for 5 or more hours, and free to sleep, on 179 out of the 182 24–hour shifts that Trocheck worked after January 22, 1996. In accord with its compensation policy, for those 179 shifts, Pellin paid Trocheck 20 hours' wages; for the other 3 shifts, Pellin paid Trocheck 24 hours' wages. Pellin examined only the 182 24–hour shifts Trocheck worked after January 22, 1996 because Trocheck filed this action on January 23, 1998 and non-willful violations of FLSA have a two-year statute of limitations, 29 U.S.C. § 255. The Court has been given no reason to believe that the "over 95%" statistic would change significantly if it employed the three year statute of limitations applicable to willful violations.

than 50%. Even though the Court agrees in part with Trocheck's assertion that Pellin did not include all work-related interruptions in its measurement of how often Trocheck enjoyed an uninterrupted night's sleep, it remains true that, on the evidence presented, a reasonable fact finder could only conclude that Trocheck usually obtained 5 hours of sleep during his sleeping period. Stated more simply: on the undisputed facts, Trocheck usually enjoyed an uninterrupted night's sleep, as a matter of law.[21]

### IV.

Finally, the Court addresses one last argument made by Trocheck. Trocheck asserts that, even if Pellin is correct that he impliedly agreed to an exclusion of sleep time from hours worked, and, even if Pellin did enforce this agreement in compliance with FLSA regulations, as the Court has held, he is still entitled to unpaid compensation for four specific shifts where he did not work 24 hours.

The FLSA regulation allows Pellin and Trocheck to agree to exclude a sleeping period from hours worked only if the "employee is required to be on duty *for 24 hours or more.*" 29 C.F.R. § 785.22(a). Trocheck points to four different shifts where he worked *less* than 24 hours, but Pellin still excluded 4 hours of sleep time as hours worked. Trocheck argues the regulation does not allow Pellin to make this sleep-time exclusion for those four shifts.

 The undisputed facts reveal, however, that for each of these four shifts, Trocheck *was* required to be on duty for 24 hours—the reason Trocheck did not work a 24-hour shift was that he reported

for duty late. Thus, for example, on February 14, 1996, Trocheck appeared for his 24-hour shift 15 minutes late, so Pellin docked him 15 minutes pay. During the designated sleeping period of this shift, Trocheck was in the station and free to sleep for nearly 8½ hours—more than the 5 hours required under the regulation. Pellin paid Trocheck for 19¾ hours—representing the 20 hours' wages to which he was normally entitled, pursuant to Pellin's standard compensation policy, minus the quarter-hour he was late. Although Trocheck did not actually work a 24-hour shift, he had been scheduled to do so. To allow Trocheck to prevail on his FLSA claim for this shift would be to give an employee an incentive to be tardy, avoid working a full 24 hours, and manipulate his pay. *This cannot be the purpose or intent of FLSA and its regulations.* The Court finds Trocheck's final argument unpersuasive.

In sum, the Court finds that, based on the undisputed facts and as a matter of law: Trocheck did not fall within the Motor Carrier Act exception to FLSA; Trocheck and Pellin impliedly agreed to exclude a regularly scheduled sleeping period of not more than 8 hours from hours worked; the sleeping facilities provided to Trocheck by Pellin were adequate; Trocheck usually enjoyed an uninterrupted night's sleep; Pellin enforced its implied agreement with Trocheck in accord with FLSA regulations; and Trocheck has not shown Pellin's policies or practices are in violation of FLSA.

Further, the Court's analysis of Trocheck's FLSA claim applies equally to Trocheck's claim brought under state law. *See* Ohio Rev.Code § 4111.03(A) ("[a]n em-

---

**21.** As noted, the Court agrees that Pellin should have included, but did not include, certain *work-related* interruptions when it measured the amount of time Trocheck was able to obtain sleep during his sleeping periods. The real gist of Trocheck's assertion that Pellin did not count many of the *non-work-related* sleep disruptions is that these disruptions made his sleeping quarters inadequate—

that is, these disruptions prevented him from enjoying a "favorable environment that would enable sleep to occur and provide reasonable assurance that [he would] be rested and alert when [his] duty time begins." 54 Fed.Reg. 41709-02, 1989 WL 293362 (F.R.) (Oct. 11, 1989). For the reasons stated above, however, the Court has already concluded that the sleeping quarters were adequate in this case.

ployer shall pay an employee for overtime ... in the manner and methods provided for in and subject to the exceptions of [29 U.S.C. §§ 207 & 213] of the 'Federal Fair Labor Standards Act' "); *Douglas v. Argo–Tech Corp.*, 113 F.3d 67, 69 n. 2 (6th Cir.1997) (analyzing claims under FLSA and Ohio Rev.Code § 4111.03 "in a unitary fashion"). Accordingly, Pellin's motion for summary judgment is granted in its entirety, and Trocheck's cross-motion is denied.

**IT IS SO ORDERED.**

### ORDER

For the reasons set forth in this Court's Memorandum and Order of this date, Pellin's motion for summary judgment (docket no. 36) is **GRANTED** and Trocheck's cross-motion for summary judgment on the issue of liability (docket no. 47) is **DENIED,** and this case is **DISMISSED.**

**IT IS SO ORDERED.**