**Jude W. DIAZ, et al., Plaintiffs,**

v.

**CITY OF PLANTATION, FLORIDA, Defendant.**

No. 05–60757–CIV.

United States District Court, S.D. Florida.

Sept. 18, 2006.

Douglas L. Steele, Thomas A. Woodley, Woodley & McGillivary, Washington, DC, Mark William Floyd, Matthew J. Mierzwa, Jr., Mierzwa & Associates, P.A., Lake Worth, FL, for Plaintiffs.

Denise Marie Heekin, James C. Crosland, Suzan Jo, Akerman Senterfitt, Miami, FL, for Defendant.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

URSULA UNGARO-BENAGES, District Judge.

THIS CAUSE is before the Court upon Plaintiffs' Motion for Partial Summary Judgment, filed March 16, 2006. (DE 43.) The Defendant filed its response on March 31, 2006 to which Plaintiffs replied on April 10, 2006. Also before the Court is Defendant's Motion for Summary Judgment, filed March 16, 2006. (DE 49.) Plaintiffs filed their response on March 30, 2006 to which Defendant replied on April 10, 2006. The matters are ripe for disposition.

THE COURT has considered the motions and the pertinent portions of the record and is otherwise fully advised in the premises.

### FACTS

The following facts are undisputed unless otherwise noted: The City of Plantation is a public agency employer under the Fair Labor Standards Act ("FLSA"). (Joint Pretrial Stipulation Statement of Uncontested Facts ("JPS") ¶ 2.) The City

of Plantation Fire Department ("Fire Department") is made up of five divisions: Suppression, Rescue, Fire Prevention, Maintenance and Support. *I.* ¶ 3. Plaintiffs are (or were) employed as paramedics or emergency medical technicians ("EMTs") in the Rescue Division. (*Id.* ¶ 8.)

The Rescue Division is a full-time advanced life support rescue service. It operates four rescue trucks that are staffed twenty-four hours per day. Each rescue truck is usually staffed with one paramedic, one EMT, and a Lieutenant, also known as a "Crew Chief[1]" (*Id.* ¶ 7; Poole Decl. ¶ 2; Def.'s Statement of Disputed Facts ¶ 1.) Paramedics and EMTs (including those with the rank of Lieutenant) are hourly compensated employees and they are paid on a biweekly basis. (JPS ¶ 9.)

The Suppression Division is staffed primarily by volunteer firefighters. (*Id.* ¶ 3.) However, some Suppression Division positions are held by paid employees, viz. Fire Chief Robert Pudney, Deputy Chief of Operations Joseph Harris, Division Chief of Training Blake Estes, Division Chief of Fire Prevention Laney Stearns, Battalion Chiefs Joel Gordon and Denise Johnson, and one Captain who is assigned to training. (*Id.* ¶¶ 4, 6; Harris Dep. 52.) City policy prohibits Rescue Division employees from volunteering as firefighters for the City (Harris Dep. 126; Andersen Dep. 22; Tofexis Dep. 23–24.)

On October 1, 2001, the City implemented a twenty-eight (28) day work period for its Rescue Division employees. Rescue employees work a regular schedule of 24 hours on, 72 hours off. During the 28–day work period the regular schedule is three 48–hour weeks and one 24–hour week. Plaintiffs are paid overtime at a rate of one and one-half times their regular rate for all hours worked outside of their regular

schedule. (JPS ¶ 10.) Prior to October 1, 2001, the Rescue Division worked rotating 12 hour shifts. On the 12–hour shift schedule, the regular work schedule was one 48–hour week and one 36–hour week for a total of 84 hours. During a biweekly pay period employees were paid overtime for hours worked over forty in a workweek; which meant 8 hours of overtime for a regular pay period Employees were also paid overtime for all hours worked outside of their regular schedule. (*Id.* ¶ 11.)

The City's EMTs and paramedics are required to hold state certifications in their fields (Pudney Dep. 71; Harris Dep. 56.) The City's volunteer firefighters, on the other hand, are required to complete the State or City firefighter training program. (Pudney Decl. ¶ 5; Harris Dep 42.) Paramedics and EMTs employed by the City are not required to be certified firefighters, but in some cases, they are dually trained as firefighters and EMTs or paramedics. (Harris Dep. 44.) Among the sixteen Plaintiffs in this action, nine are not and have never been certified firefighters (Adams Dep. 42; Barnet Dep. 11; Allen–Meizoso Dep. 7; Stillwell Dep. 11; Tribie Dep. 30; Kluver Dep. 23; Neri Dep. 22–23, 75–76; Terheun Dep. 52–53; JPS ¶ 15); while seven have completed firefighter training. Specifically, Plaintiffs del Rosario, R. Diaz, Poole, Srbovan, and Tofexis have completed Firefighter II training (del Rosario Dep. 10; R. Diaz Dep. 18; Poole Dep. 45; Srbovan Dep. 9; Tofexis Dep. 25), Plaintiff Carratala has completed Firefighter I training (Carratala Dep. 25), and Plaintiff J. Diaz has completed the basic fire-fighter training. (J. Diaz Dep. 18.)

Paramedics and EMTs receive training in extrication, hazardous materials, and fireground operations as part of their ini-

---

**1.** The Lieutenant is a paramedic who has achieved that rank in the Fire Department.

tial certification. The training focuses on patient treatment during incidents requiring these skills or knowledge as well as how to avoid getting in the way of or hindering the firefighters. (Poole Dec. ¶ 15). To maintain their certifications, paramedics and EMTs are required to complete Continuing Education Units ("CEUs"). Every three years, EMTs must complete 30 CEUs and paramedics must complete 40 CEUs Also, they must annually re-certify in CPR. All training necessary to satisfy the CEU requirements is offered within the Fire Department. (Gordon Dec. ¶ 3, Ex. A; Barnet Dep. 9–11.) EMTs and paramedics generally train for at least one hour per shift. The Crew Chief is responsible for ensuring that the training is completed. (Gordon Dec. ¶ 4; Andersen Dep. 81–87.)

The Fire Department training programs are categorized as follows: First Responder; Administration; Dive Rescue; Driver Training; Emergency Medical; Firefighter 1; Firefighter 2, Fire Suppression; Fire Training Modules; HazMat Techniques, Fire Inspector; Live Burns; Miscellaneous; Officers Training; Pump Operator; Search Rescue; and Tactics (Gordon Dec. ¶ 5.) There are training programs that count toward CEUs for paramedics and EMTs in each category except for Administration, Fire Inspector, Live Burn, Pump Operator, and Tactics, but not all of the modules comprising a single training category are available to the EMTs and paramedics for CEU credit. (*Id.*) For example, of the 13 modules comprising the Dive Rescue training, only the Medical Dive Module counts towards their CEUs. (*Id.* Ex. A 1.) In the Firefighter 1 category, two programs out of forty-one are eligible for CEU credit: Personal Protective Clothing/Equipment and Forcible Entry/Forcible Entry Tools. Similarly, three programs out of twenty-five in the Firefighter 2 category count towards CEUs. (*Id.* Ex. A 4–6.) In the Fire Suppression category, fifteen of the twenty-eight programs offered qualify for CEU credit for paramedics and EMTs (*Id.* Ex. A 6); these programs relate to SCBA, extrication and forcible entry, victim rescue, and incident management. (*Id.* Ex. A 6–7.) By contrast, all of the fifty-seven programs in the Emergency Medical category count towards CEUs for paramedics and EMTs (*Id.* Ex. A 2–4), also all sixteen of the HazMat Techniques programs are available for CEU credit. (*Id.* Ex. A 7–8.)

Additionally, paramedics and EMTs may participate in any of the programs offered by the Fire Department on a non-credit basis. For example, rescue employees may occasionally engage in fire suppression training such as knot tying by observing or participating in a limited manner in a training session, simply because the Suppression Division volunteers are training during the rescue employees' shifts and they are all in the room together. (Poole Dec. ¶ 17; Adams Dep. 38.) Occasionally, there is also joint training. (Johnson Dep. 10–11.) Also, Plaintiffs have participated in elevated victim rescue drills, extrication drills and mass casualty incident drills with the Suppression Division. During the drills, the rescue employees participated as medical responders treating victims and ensuring victims were removed safely without further injury or complication. (Poole Dec. ¶ 18; Adams Dep. 38–41; del Rosario Dep. 70–72, 81–83; Stilwell Dep. 56–57; Tofexis Dep. 57–58.)

Paramedics and EMTs are equipped with coats and pants that are only "flash rated," rather than the "full turnout" protective gear issued to volunteer firefighters which contains a thermal layer. Flash rated gear may not be used to enter a burning building. Also, rescue employees are not issued a PB1 hood. (Harris Dep. 83, 145; Johnson Dep. 89.) Rescue em-

ployees are issued the same helmets and gloves as the volunteer firefighters, and the same boots upon request. (*Id.*, Poole Dec. ¶ 7.) Firefighters who work as staff officers and engine drivers are not required to wear full turnout gear at the scene of a fire (Harris Dep. 137–138); however, these firefighters are issued the gear and are required to don it when needed. (Poole Dec. ¶ 7.)

Rescue personnel are not equipped with self contained breathing apparatus (SCBA) which is often used in fire suppression (Diaz Dec. ¶ 13; Harris Dep. 83.) Rescue personnel are not required to be trained in use of SCBA. (*Id.*) Such training is required for certified firefighters, so those employees with firefighter certification have received training in the device. (Pudney Supp. Dec. ¶ 2.)

The City's rescue vehicles are advanced life support vehicles and are equipped with medical supplies and life support equipment. (Johnson Dep. 23, Pudney Dep. 79–83.) The vehicles are equipped in accordance with the State of Florida requirements for EMS vehicles. (Poole Dec. ¶ 6, Ex. E.) The rescue vehicles do not carry fire hoses, water tanks, ladders, or water pumps. (Gordon Dep. 118–19.) The vehicles are equipped with two fire extinguishers and also carry a set of basic tools that can be used to effectuate forcible entry and extrication (i.e., center punches, pry axes, and screw drivers). (Johnson Dec. ¶ 2, Ex. A.) The rescue vehicles do not carry specialized extrication equipment such as hydraulic jacks, cutting torches, "jaws of life," fire axes, rabbit tools, or K–12 saws. (Poole Dec ¶ 6.)

The Fire Department's Response Plan, Policy # 96–40, sets forth guidelines to provide for prompt, effective and safe initial responses to emergencies. Rescue units are part of the initial response plan for several types of emergencies, including structure fires, extrications, vehicle accidents, dive rescues, medical rescues, aircraft down, hazardous materials, and mass casualty incidents. (Pudney Dec. ¶ 4, Ex. A.) Rescue units generally respond Code One (no lights or sirens, obey traffic laws) to structure fires and hazardous materials calls, while the Suppression Division responds Code Three (lights, sirens, go through intersections, etc.). (Poole Dec. ¶ 5.) The Suppression Division responds to a number of call types without the Rescue Division unless the rescue unit is specifically requested for a medical purpose. These calls include all fire alarms, vehicle fires, brush fires, dumpster fires, bomb threats, elevator rescue, landing zone, water evacuation, mutual aid, wires down, smoke in the area, and smell of gas. (*Id.*, Pudney Ex. A.)

When multiple units are dispatched as an initial response to an emergency, the senior officer of the first responding unit establishes command. According to Plaintiffs, the rescue unit is often not the first to arrive because they respond Code One while the Suppression Division responds Code Three. (Poole Dec. ¶ 8.) The City disputes this fact and contends that the rescue unit more often than not arrives first. (Pudney Dec. ¶ 6.) If the rescue unit is first on the scene of a fire, the Rescue Lieutenant establishes command. (*Id.*) Pursuant to Policy # 96–28, "EMS Procedures at Fire Operations" when the rescue unit arrives first, it is to position itself so as not to block fire apparatus or suppression activities; additionally, "The crew should provide a brief size-up over the assigned channel and establish command. Upon arrival of the first suppression unit, command will be transferred to the officer or ranking firefighter on the truck." (Diaz Dec. Ex. G.) Command is typically transferred to a Staff Officer.[2] (Harris Dep.

2. Staff Officer is defined as Battalion chief and above. (Harris Dep. 88.)

88.) Contrary to the written policy, however, command might not be transferred immediately if the suppression unit needs upon arrival to attend to some urgent matter. (*Id.* 75.)

When the rescue unit is the first responder, it is responsible for surveying the scene by conducting what the witnesses referred to as a scene "size-up." (del Rosario Dep. 69; Srbovan Dep. 48–49.) The person doing the size-up reports his observations via the radio and the information conveyed can cause the response plan to be altered. (Poole Dep. 128–129; Neri Dep. 25–29; Terheun Dep. 26–32.) Plaintiff Neri testified that he can downgrade resources that are responding to a scene based on such information, but a fire battalion chief would usually make the call for additional resources. (Neri Dep. 25–29.)

To illustrate the role of the rescue unit as a first responder at the scene of a common emergency, Plaintiff Neri testified that fire calls relating to burned pots were common. In the case of such a call, the rescue unit would respond first to the location and direct anyone inside the affected structure to vacate it; then when the firemen arrived, the firemen would don their breathing apparatus and enter the structure to make sure it was safe. (*Id.*) If, on the other hand, when the rescue unit arrived, the smoking pot was outside and "it was basically taken care of," the rescue unit personnel would report it to the chief on duty who usually would send an engine Code One to see if the house needed further ventilation, and the Suppression Division then would do a fire report. (*Id.*) Plaintiff Carratala testified that if a responding rescue unit finds no visible smoke or fire, members of the rescue crew might walk the hallway of the building to make sure everyone was out. (Carratala Dep. 56–57.) Battalion Chief Johnson testified that rescue crews investigate and secure electricity. She stated, "[I]f they know the structure is occupied, [the rescue unit] will go in and evaluate and see if there's a smoke environment. I mean, we've had rescue crews that pull pots off the stove, put stove fires out with their fire extinguishers." (Johnson Dep. 38.)

Policy # 96–28, states under the heading Purpose, "Due to the potentially high risk for injury at a fire scene and the need for on-going rehabilitation of fire personnel, it is a necessary obligation of the rescue unit to be present at all fire operations where a high index for injury exists." (Diaz Dec. Ex. G.) The Policy # 96–28 further provides that if a structure is occupied, "At no time will a member of the rescue crew attempt to make entry into a hazardous or potentially hazardous environment." (*Id.*) The record is disputed respecting the viability of the policy. According to the City's witnesses, Policy # 96–28 does not reflect the current practices of the Fire Department (Supplemental Dec. Pudney ¶ 3, Pudney Dec. Ex A; Pudney Dep. 43–44.) Plaintiffs, on the other hand, maintain that the policy remains in place. Further, Deputy Chief Harris testified that the paramedics and EMTs have not been told not to follow the policy. (Harris Dep. 76–78.)

Currently, the rescue unit provides medical treatment to the injured (either citizens or firefighters) and rehabilitates firefighters at the scene of a fire. "Rehab" is an area for firefighters to rest, rehydrate, and get treatment. (Harris Dep. 10.) Rehab is usually staffed with rescue personnel. Plaintiffs are not aware of any occasion when fire personnel or a staff officer staffed a Rehab area. (Poole Dec. ¶ 11.)

In order to "directly engage in hazardous operations, such as interior structural firefighting and hazardous material-incident mitigation," Florida law requires a person be trained to the level required by the State or local government. Fla. Stat.

§ 633.35(2). Nonetheless, Battalion Chief Johnson on occasion has directed rescue personnel to lay a supply line or disconnect electricity. (Johnson Dep. 41–43, 91–92.) Plaintiff Carratala recalled a single occasion where he moved a hose out of the way when the Suppression Division was bringing in a new engine (Carratala Dep. 58.) There also is evidence of two specific instances where rescue employees actually extinguished a fire: Plaintiff Neri used a fire extinguisher on a small vehicle fire on the Turnpike (Johnson 95; Neri 32), Plaintiff May used a fire extinguisher on a phone book that was smoldering in an exterior hallway (May Dep.30–31).

Rescue units also respond to hazardous material incidents ("hazmats"). A 1996 policy, # 96–20, "EMS Response to Hazardous Material Incidents" states:

> At no time is a rescue unit or its personnel to be used to search for the source of a hazardous material spill, or locate the site of a spill.

> The duties of paramedics at a hazardous materials incident are to receive victims that have been field decontaminated and provide the care necessary for stabilization and transport to the hospital. AT NO TIME ARE PARAMEDICS TO BE INVOLVED IN THE MITIGATION OF A HAZARDOUS MATERIALS INCIDENT.

(Diaz Dec. Ex. K.) The viability of this policy also is in dispute. On October 11, 2001, Fire Chief Pudney issued a Haz–Mat Response Directive which, according to him, replaced the prior policy. (Pudney Supp. Dec. ¶ 3, Ex. A.) However, Deputy Chief Harris stated in his deposition that the policy is still in effect, but that rescue personnel could be assigned to non-medical functions at a hazmat scene such as turning off the gas valve to a propane tank. (Harris Dep. 112–121.) In his deposition, Battalion Chief Gordon stated that Policy # 96–20 is not in effect and not accurate because the rescue crew is not a separate entity as implied by the policy, but an integral part of the hazmat operation. According to Gordon, paramedics could be involved in mitigation "whenever the situation deems it necessary," but he also acknowledged that only a certified firefighter can enter a level A potentially hazardous environment. (Gordon Dep. 116–118.)

Suppression Division personnel perform search and rescue operations with regard to persons trapped or imperiled by fire. (Diaz Dec. ¶ 25.) The Suppression Division also provides rescue and extrication services at structural fires, disasters, aircraft crashes, vehicle fires where a victim is trapped, other entrapment situations (involving automobiles, elevators, etc.) and other rescue scenes. (*Id.*) Firefighters use advanced extrication equipment such as jaws of life to perform rescue and extrication activities. (*Id.*) Rescue employees, on the other hand, do not generally engage in rescue and extrication activities, except by providing medical assistance to the victim. (*Id.*) If a rescue unit arrives on the scene of a medical call requiring a forcible entry, they are to request firefighter assistance. However, depending on the exigencies of a situation, they might not always wait until the firefighters arrive. (Harris Dep. 102–03.) In response to a medical emergency, rescue employees have taken a screen off or attempted to go in through an open window. (Johnson Dep. 52–55; May Dep. 32–34.) Rescue employee May once broke an apartment window and once kicked a door in to respond to a medical call. (May Dep.32–34.) Similarly, rescue employees have used the "center punch" tool and adhesive paper to break a car window to gain access to a child locked in a vehicle who was showing signs of medical distress. (Barnet Dep. 34–36; Poole Dec. ¶ 14.)

As representative of actual practice, the parties stipulated to three months of Fire

Department calls, July 2004, November 2004, and March 2005, to illustrate calls to which Rescue and Suppression Division personnel are dispatched. (Diaz Dec. ¶ 30). The calls are categorized as alarms, civil assists, extrication, fire, medical, and vehicle accidents. During the three month period the Suppression Division responded to a total of 512 calls. (Estes Dec. ¶ 5.) During the same period, the Rescue Division responded to 83 fire calls, 13 extrications, 4 hazardous materials, 14 alarms, and 35 civil assists; this number totals 145 calls. (Estes ¶ 5, Ex. C). The City claims that only 330 of the 512 calls were legitimate fire calls. The City then computes the ratio of 145 to 330 to say that the Rescue Division responded to 44% of the legitimate fire calls. Comparing the number of "fire calls" the Rescue Division responded to (83) to the number of legitimate fire calls (330), it responded to 25% of fire calls.

During the period, the Rescue Division responded to a total of 2,110 calls. (*Id.* ¶ 6, Ex. C.) Of these, 100 or 4.7% were for extrications, fires, and hazardous materials; and 281, or 13.32%, were for vehicle accidents. (Diaz Dec. Ex. L.) The remaining 81.94% of calls were for medical alarms, civil assists and medical calls. (Estes Dec. Ex. C.) In twenty instances, the Suppression Division responded to a medical call by itself. (*Id.*)

In terms of hours, the Rescue Division worked an aggregate of 8,832 hours. (*Id.* ¶ 7.) Of these hours, 1, 414 were spent responding to all calls. (*Id.*) Of the total call run time, 1,192 hours (13.5%) were spent responding to medical alarms, civil assists and medical calls, while 222 hours (2.51%) were spent responding to extrications, hazardous materials, fires, and vehicle accidents. (Estes Dec. Ex. C.) The remaining 7,418 hours, or 84% of total hours were spent at the station. When rescue employees are not on calls, they engage in activities related to their call duties such as completing run reports, entering run data into the computer, checking medical supplies, engaging in training, cleaning and maintaining the rescue vehicles, meeting with supervisors, training personnel and administrators, and performing blood pressure tests. (Diaz Dec. ¶ 33; Harris Dep. 61–65) The remainder of their time includes cleaning the station, eating meals, sleeping and personal time. (Harris Dep. 61–65; Allen–Meizoso Dep. 54; Andersen Dep. 75–81; Barnet Dep. 28–29, Terheun Dep. 94–95.)

### LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56. The Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion.

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings, after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d

551, 553 (11th Cir.1997); *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981).[3] Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). If reasonable minds might differ on the inferences arising from undisputed facts then the court should deny summary judgment. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1031 (5th Cir.1982); *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes,* 398 U.S. at 160, 90 S.Ct. 1598. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611–12 (5th Cir.1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505.

**3.** Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the

## ANALYSIS

### Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move the Court to grant summary judgment on the issue of liability for overtime compensation pursuant to Section 7(a) of the FLSA (29 U.S.C. § 207(a)) because Plaintiffs do not fall within the exemption to the 40–hour overtime standard for employees engaged in fire protection activities contained in Section 7(k) of the FLSA. 29 U.S.C. § 207(k). Specifically, Plaintiffs argue that: (1) the City fails to carry its burden as an employer seeking the benefits of an exemption under the FLSA; (2) Plaintiffs do not meet the criteria for employees engaged in fire protection activities under clear language of sections 207(k) and 203(y) of the FLSA; and (3) Plaintiffs are not employees engaged in fire protection activities under the regulations of the U.S. Department of Labor ("DOL"). The Court will address each of Plaintiffs' arguments in turn.

■ As an initial matter, Plaintiffs argue that the City has the burden of proof in this action because it is the employer seeking the benefit of an FLSA exemption. It is well settled that exceptions or exemptions under the FLSA are to be narrowly construed against the employer asserting them; therefore, their application must be plainly and unmistakably within the terms and spirit of the exemption. *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); *O'Neal v. Barrow County,* 980 F.2d 674, 677 (11th Cir.1993); *Freeman v. City of Mobile,* 146 F.3d 1292, 1297 (11th Cir.1998). Accordingly, the City must demonstrate that each element of the § 207(k) exemption is applicable to Plaintiffs.

Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

*A.   Section 207(k) and 203(y)*

Section 7(k) is a partial exemption for employees engaged in fire protection and law enforcement activities.   29 U.S.C. § 207(k).   Employers need not compensate these employees for overtime until they work more than 212 hours over the course of a 28 day period 29 C.F.R. § 553.32(b).   In December 1999 Congress amended the FLSA to add § 203(y) which provides a definition for the term "employee in fire protection activities."[4]   The text of the statute is as follows.

> (y) "Employee in fire protection activities" means an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who—
> (1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and
> (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

29 U.S.C. § 203(y).

Plaintiff argues the City cannot meet its burden of proving entitlement to the overtime exemption of 207(k) because the uncontested facts of this case plainly establish that Plaintiffs are:  (1) not trained in fire suppression, (2) do not have the legal authority and responsibility to engage in fire suppression.

*1.   Training in fire suppression*

Specifically, with regards to training, Plaintiff argues that the State of Florida has established minimum training and certification requirements for individuals to be engaged in fire suppression activities in the State and cites Florida Statute § 633.34, which set qualifications for employment as a firefighter, and § 633.35, which obligates the division of state fire marshal to establish a training program for firefighters and to issue certificates of compliance upon completion of the training.   Notably, § 633.35(2) states that a person who does not hold a certificate of compliance (and who has been grandfathered in) "may not directly engage in hazardous operations, such as interior structural firefighting and hazardous-materials-incident mitigation."   Fla. Stat. § 633.35(2).   Plaintiffs further argue that 29 C.F.R. § 553.210, the promulgation of which pre-dated the enactment of § 203(y), establishes that to be "an employee in fire protection activities" one must be "trained to the extent required by State statute or local ordinance."[5]   29 C.F.R. § 553.210(a)(2).   Plaintiffs argue that Congress did not disavow this common-sense standard when it enacted § 203(y).

---

**4.**  Prior to December 1999, the FLSA did not provide its own definition of an employee engaged in fire protections activities.   Rather, the DOL promulgated regulations addressing the issue, which are codified at 29 C.F.R. § 553.

**5.**  Section 553.210(a) provides:
  As used in section[ ] 7(k) ... of the Act, the term "any employee ... in fire protection activities" refers to any employee (1) who is employed by an organized fire department or fire protection district; (2) who has been trained to the extent required by State stat-

ute or local ordinance;  (3) who has the legal authority and responsibility to engage in the prevention, control or extinguishment of a fire of any type; and (4) who performs activities which are required for, and directly concerned with, the prevention, control or extinguishment of fires ... The term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection activities.   See § 553.215.
  29   C.F.R. § 553.210(a).

In response, the City argues that Plaintiffs have incorrectly construed "training in fire suppression" to mean "certified" as a firefighter. The City argues that in order to correctly interpret § 203(y) and give meaning to the use of the words "paramedic, emergency medical technicians, rescue worker, ambulance personnel, or hazardous materials worker" in the statute "training in fire suppression" must mean something other than "certified." The City further responds that had Congress wanted to adopt the language of 29 C.F.R. § 553.210(a), it could have easily incorporated it into § 203(y) and that the regulation needs to be revised.[6]

Plaintiffs argue in reply that requiring individuals to be trained to the extent required by Florida statute does not render inclusion of the terms "paramedics, emergency medical technicians, rescue workers, ambulance personnel or hazardous materials workers" meaningless or superfluous. Instead, Plaintiffs contend that the statute has been carefully drafted to cast a wide net to capture all certified firefighters, regardless of their position title. Under this view, an individual who is a trained firefighter and holds the title paramedic would be covered by § 207(k) (should the other elements also apply), but a paramedic who lacks the necessary training, certification, and legal authority would not be covered because the training and legal authority prongs of § 203(y) would not have been met.

The City further argues that Plaintiffs' interpretation is at odds with the legislative intent of § 203(y). The City, in its motion for summary judgment, explains that the DOL regulations addressing the § 7(k) exemption and its application to public employees who are EMTs and paramedics has been the subject of much litigation in the 1990's resulting in rulings that as a whole are confusing and overly complex. For example, different tests are applied when rescue personnel are employed by the a fire department versus when they are employees of a public agency other than a fire protection or law enforcement agency. *See Wouters,* 9 F.3d at 924–31; *O'Neal,* 980 F.2d at 675; *Falken v. Glynn Cty.,* 197 F.3d 1341 (11th Cir.1999). The City argues that Congress amended the FLSA by adding a definition of "employee in fire protection activities" because the judicial interpretations of the 7(k) exemption had exposed several local governments to liability and § 203(y) was meant to alleviate this burden. The City argues that the Congressional Record reflects this purpose. *See* 106 Cong. Rec. H11499 (Nov. 4, 1999).

Plaintiffs respond to this argument by asserting that the meaning of § 203(y) is clear on its face, and that there is no need to delve into legislative history; nonetheless, review of the Congressional Record supports their interpretation. Plaintiffs point out that on the House floor, Congressman Clay stated that the bill:

> provides that where firefighters are cross-trained and are expected to perform both firefighting and emergency medical services, they will be treated as firefighters for the purpose of overtime. However, where emergency medical technicians are not cross-trained as firefighters, they will remain outside the purview of 7(k) and will be entitled to overtime after 40 hours a week, even if

---

6. The City's use of dicta from *Lockwood v. Prince George's Cty.,* 217 F.3d 839, 2000 WL 864220 (4th Cir.2000), an unpublished Fourth Circuit opinion, to argue that the four-part definition of § 553.210(a)(1)-(4) needs to be revised is not particularly instructive. The Fourth Circuit is referring specifically to the language of § 553.210(a)(3) compared to § 203(y)(2). Plaintiff does not argue in its motion § 203(y)(2) is not satisfied.

the emergency medical services are placed within the fire department. 145 Cong. Rec. H11500. Plaintiffs also argue that when Congress revisited the FLSA in 1999 it obviously had the ability to create an overtime exemption for single-role paramedics, EMTs or employees engaged in emergency medical activities, but it limited the partial exemption to employees who are trained in fire suppression and have the legal authority and responsibility to engage in fire suppression.

█ The specific meaning of the term "trained in fire suppression" in § 203(y) is an issue of first impression. Thus far, all decisions applying the § 203(y) definition of "employee in fire protection activities" to the § 207(k) partial exemption have involved trained firefighters or dual-certified paramedic/EMTs. *See McGavock v. City of Water Valley, Miss.* 452 F.3d 423 (5th Cir.2006); *Cleveland v. City of Los Angeles* 420 F.3d 981(9th Cir.2005); *Weaver v. City and County of San Francisco,* 2006 WL 2411455 (N.D.Cal.2006); and *Chavez v. City of Katy Tex.* 2005 WL 1657037 (S.D.Tex.2005). The Court is persuaded by Plaintiffs' arguments that "trained in fire suppression" continues to be informed by 29 C.F.R. § 553.210(a)(2). Prior to 1999, § 553.210(a) was the only definition of an employee engaged in fire protection activities. It appears obvious from comparison of the texts, that when Congress amended the FLSA to add a statutory definition, the language they used was modeled on the regulation. While Congress did not use the words "to the extent required by State statute or local ordinance" in its definition, they also did not see fit to explain or modify the term "trained in fire suppression" in an alternate way. The Court is therefore satisfied that the meaning of the term in § 203(y) is substantially the same as its meaning in the regulation.

█ As it is undisputed that some Plaintiffs have not been trained as firefighters pursuant to Florida law, the City fails to establish the exemption as to those Plaintiffs as a matter of law. However, the Court recognizes that the City has met its burden for those Plaintiffs who have been certified. The plain language of § 203(y) does not require that the employer train the employee, but only that the employee be so trained. *See Chavez,* 2005 WL 1657037 n. 1.

In reaching these conclusions, the undersigned recognizes that the City argues for a broader view and points to evidence that it made fire suppression training available to Plaintiffs, but proof of the availability of training is not enough to create a dispute of material fact: § 203(y), by its terms, appears to require actual training. The City also argues that paramedics and EMTs receive initial training in extrication, hazardous materials, and fireground operations; and occasionally the rescue and suppression divisions engage in joint training. However, the undisputed facts show that this training, insofar as it is directed to the paramedics and EMTs, focuses on patient treatment and avoiding hindering firefighter response. Accordingly, the City has failed to meet its burden to produce evidence that the Plaintiffs who are not certified as firefighters actually are trained in fire suppression.

*2. Legal Authority and Responsibility*

Because some Plaintiffs are certified, the Court must also address whether Plaintiffs have the legal authority and responsibility to engage in fire suppression. Plaintiffs argue that they lack the legal authority and responsibility to engage in fire suppression. Plaintiffs look to *Cleveland;* there the Ninth Circuit determined that applying the "ordinary, common-sense meaning" of the word, "to have 'responsi-

bility' to engage in fire suppression, [plaintiffs] must have some real obligation or duty to do so. If a fire occurs, it must be their job to deal with it." *Cleveland,* 420 F.3d at 990. Plaintiffs then look to two Fire Department policies, # 96–28 and # 96–20, to show that they do not have the responsibility to engage in fire suppression and in fact they are forbidden from doing so. Additionally, Plaintiffs maintain that they lack the necessary equipment to engage in fire suppression: they do not carry water, hoses or ladders on their vehicles; they do not have breathing apparatuses; and their coats are not rated for entering structural fires or engaging in fire suppression.

■ In response, the City argues that fire suppression involves more than just extinguishment of fires; in its view, treating victims and rehabilitation of personnel are essential components of fire suppression. As support for this position, the City cites *Lang v. City of Omaha,* 186 F.3d 1035 (8th Cir.1999), which advances the view that "[s]imply because the division of labor and the development of specialities at a fire scene relegates the paramedics to a medical support function does not mean that they are any less directly concerned with the firefighting effort than the individual who runs into a burning building." *Id.* at 1038. However, the facts of that case are clearly distinguishable from the case here (not least because *Lang* does not apply § 203(y)). In *Lang,* the paramedics were "sworn and trained firefighters" who satisfied the § 553.210(a) four part test. The court acknowledges where the paramedics were not trained firefighters, "division of labor" is not applicable: "[P]aramedics 'who are not permitted to fight fires or enter a burning building and who are only dispatched to fires to treat injured individuals are not engaged in fire protection activities under the four-part test.'" *Id.* (quoting *Nalley v. Mayor and City Council of Baltimore,* 796 F.Supp. 194 (D.Md.1992)).

■ The City admits that none of the Plaintiffs is authorized by City policy to enter a structure fire or hazardous environment, but argues that Plaintiffs have the legal duty and responsibility to engage in a wide variety of activities that are crucial components of fire suppression, such as incident command and rehabilitation of firefighters. The undisputed evidence shows that rescue employees provide a limited role as the first responder to the scene of a fire. They provide scene size-up information and remain in command until the Suppression Division takes command; which generally occurs immediately upon the arrival of the firefighters. Although there is evidence that rescue may keep command longer if the firefighters have an immediate need to act, the City has offered no evidence that the rescue unit plays any additional firefighting role on those occasions. It is undisputed that the Rescue Division is responsible for rehabilitation, which is essentially medical support for firefighters. As discussed in *Cleveland,* a responsibility to treat the injured at fire scenes, including treating exhausted firefighters, is not the same as having responsibility to engage in fire suppression. *Cleveland,* 420 F.3d at 984, 990.

The City's second line of argument focuses upon the facts that Plaintiffs can engage in fire suppression by using a fire extinguisher or flake hose; and that for those rescue employees who are certified, they have the legal authority and responsibility to enter a burning building if provided appropriate gear and ordered to do so. There is evidence that Plaintiffs have used fire extinguishers on two occasions and once moved a hose; however, the City has presented no evidence that Plaintiffs had or have any obligation to do so.

While Plaintiffs may engage in such activities from time to time due to the exigencies of the situations they confront, the City has not presented evidence which creates a genuine issue of material fact with respect to Plaintiffs' legal authority and responsibility to engage in fire suppression. First, the City presents no evidence that the City relies on the Rescue Division employees for fire suppression. Secondly, no reasonable juror could find that on the basis of two instances of using a fire extinguisher, an act which admittedly anyone can do, and one instance of moving a fire hose, that Plaintiffs have been assigned the responsibility to engage in fire suppression.

In finding that the dual function paramedics in *Cleveland* did not have the responsibility to engage in fire suppression the Ninth Circuit considered the following: (1) paramedic ambulances did not carry firefighting equipment or breathing apparatuses; (2) dispatchers did not know if they were sending single or dual function paramedics to a call; (3) paramedic ambulances were not regularly dispatched to fire scenes and were dispatched only when there appeared to be a need for advanced life support medical services, (4) dual function paramedics were not expected to wear fire protective gear; (5) dual function paramedics were dispatched to a variety of incidents at which they were expected to perform only medical services; and (6) there was no evidence that a dual function paramedic had ever been ordered to perform fire suppression. *Cleveland*, 420 F.3d at 990.

The undisputed facts in this case are similar to those in *Cleveland*. Plaintiffs are not equipped with firefighting equipment or gear; rescue units are only regularly dispatched to fire scenes where there is a need for medical services (including rehab); they also respond to purely medical calls; and there is no evidence that a rescue employee has been ordered to perform fire suppression. Consequently, Plaintiffs do not have the responsibility to engage in fire suppression.

Thus, although some Plaintiffs are trained in fire suppression and have responded to emergency situations where life, property, or the environment were at risk, Defendant has not presented evidence that Plaintiffs have the legal authority and responsibility to engage in fire suppression. As a result, the City has neither met its burden to show entitlement to summary judgment nor presented evidence to raise a genuine issue of material fact regarding whether Plaintiffs are "employee[s] in fire protection activities" within the meaning of § 203(y) such that they are exempt under § 207(k).

## B. Department of Labor Regulations

Finally, Plaintiffs argue that they are not employees engaged in fire protection activities under the DOL Regulations. 29 C.F.R. § 553.210(a) defines the term "any employee in fire protection activities." In pertinent part, the regulation states:

> As used in sections 7(k) and 13(b)(20) of the Act, the term "any employee ... in fire protection activities" refers to any employee (1) who is employed by an organized fire department or fire protection district; (2) who has been trained to the extent required by State statute or local ordinance; (3) who has the legal authority and responsibility to engage in the prevention, control or extinguishment of a fire of any type; and (4) who performs activities which are required for, and directly concerned with, the prevention, control or extinguishment of fires ... The term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection activities. See § 553.215.

29 C.F.R. § 553.210(a). As discussed above, Plaintiffs do not meet the four-part test because they do not have the legal authority and responsibility to engage in fire prevention. (Those Plaintiffs who are not trained in fire suppression also fail on that ground.) Plaintiffs further argue that the final sentence of the regulation, the "integral part" test, does not apply because it refers to 29 C.F.R. § 553.215 which applies to "employees of a public agency other than a fire protection ... agency" and the Rescue Division is a part of the City's Fire Department.

However, the Eleventh Circuit has recognized that, "EMS personnel" may also fall into the exemption for firefighters or police officers if they "form *an integral part* of the public agency's fire protection activities." *Wouters,* 9 F.3d at 931. That is, employees who do not satisfy the four-part test may still fall under the § 207(k) exemption. Yet, an employer may lose the protection of the exemption if those employees spend more than 20 percent of their total hours working in "nonexempt" activities. This "80/20 rule" is applicable to rescue personnel brought within the exemption by § 553.210. *O'Neal,* 980 F.2d at 680.

Plaintiffs argue that based on the call run data produced by the City, Plaintiffs cannot be subject to the § 207(k) exemption because they spend nearly all of their time on nonexempt activities. In response, Defendants argue that the 80/20 rule does not take Plaintiffs out of the exemption because time spent awaiting calls is exempt, and assert that 84% of Plaintiffs time is spent performing such exempt work.

Nonexempt work is that "which is not performed as an incident to or in conjunction with [the employees'] fire protection or law enforcement activities." *Wouters,* 9 F.3d at 929. Therefore time spent performing medical calls is clearly nonexempt. In the representative months, 13.5% of the Rescue Division's time was spent responding to medical alarms, civil assists and medical calls, while 2.51% were spent responding to extrications, hazardous materials, fires, and vehicle accidents. This means that 84% of time was spent not responding to calls. In the City's view, all of this time is exempt time because it was spent awaiting calls. However, the rule in *O'Neal* is that station time is exempt only to the extent that is not spent performing tasks that are unrelated to fire protection. *O'Neal,* 980 F.2d at 682. The undisputed facts establish that Plaintiffs spent significant time performing tasks related to their medical duties such as such as completing run reports, entering run data into the computer, checking medical supplies, engaging in training, cleaning and maintaining the rescue vehicles, meeting with supervisors, training personnel and administrators, and performing blood pressure tests.

The City has not met its burden of satisfying the 80/20 rule. The undisputed facts establish that more than 20% of Plaintiffs time was spent on nonexempt activities. Since the percentage limitation on nonexempt work has not been met, Plaintiffs are entitled to partial summary judgment on the issue of liability.

### Defendant's Motion for Summary Judgment

For the reasons discussed above, the Court rejects Defendant's claim that the § 207(k) exemption applies. The Court will now address Defendant's two alternate arguments presented in its Motion for Summary Judgment. (1) Plaintiffs are not entitled to liquidated damages; and (2) a two-year statute of limitations applies. The Court will address each in turn.

First, the City argues that when it changed the rescue schedule to 24-hour

shifts it acted in good faith after consultation with labor counsel, and that as a result Plaintiffs are not entitled to liquidated damages under the Portal–to–Portal Act. 29 U.S.C. § 260. Section 11, provides the employer with a defense to a mandatory award of liquidated damages when it can show good faith and reasonable grounds for believing it was not in violation of the FLSA. *See, e.g. Washington v. Miller,* 721 F.2d 797, 804 (11th Cir.1983).

As evidence of its good faith, the City presents evidence that the Rescue Division was unhappy with the 12–hour shift schedule and wanted to be placed on a 24–hour shift, the City adjusted the pay rate so that Plaintiffs received their pay on a bi-weekly basis after the change, and the City consulted with its labor and employment counsel, James Stokes, to determine whether the new schedule and proposed method of payment were permissible under the FLSA. Plaintiffs argue that the City did not have a reasonable basis for its belief that its overtime pay policy conformed to the requirements of the FLSA because counsel was not adequately informed of the facts surrounding Plaintiffs' employment.

On September 21, 2001, Deputy Chief Harris issued a memorandum announcing the decision to implement the change to 24 hour shift schedule for the Rescue Division, effective October 1, 2001. (Harris Dec. Ex. A). Then on September 25, 2001, Stokes issued a brief opinion letter that recites the language of the 1999 amendment (Stokes Dep. Ex. A). In his deposition, Stokes testified that he made his determination based on phone conversations with Harris. (*Id.* 17.) He did not review any other documents, letters, correspondence or other memorandum from Harris such as training records or logs and he did not interview any EMTs or paramedics regarding their job duties. (*Id.* 16–21.) Stokes also testified that he had

personal knowledge of the § 7(k) exemption based on his involvement in a state court case called *Crehan v. Monroe County.* (*Id.* 36–40.) By his account, the case was similar because it involved single purpose EMTs and paramedics (although it was filed before the 1999 amendment); it was eventually dismissed for lack of prosecution after DOL investigators determined that the county had properly relied on the § 7(k) exemption. (*Id.*)

■ The City contends that its consultation with counsel shows that it did not take an "ostrichlike" approach to the Act, and liquidated damages are inappropriate. *See Roy v. County of Lexington, South Carolina,* 141 F.3d 533, 549 (4th Cir.1998). There, the decision not to award liquidated damages by the district court in that case followed a bench trial. *See Roy v. County of Lexington,* 928 F.Supp. 1406 (D.S.C., 1996). In this case, only Stokes' deposition contains evidence respecting his communications with the City and that testimony is somewhat conclusory and otherwise not sufficiently developed to shift the burden of producing conflicting evidence to Plaintiffs. Therefore, while the City has presented some evidence of its entitlement to a defense, it has not met its burden of showing that it is entitled to the defense of good faith as a matter of law.

■ The City also argues that a two year statute of limitations applies. The statute of limitations for an alleged FLSA violation is two years, unless the violation is willful, in which case the statute of limitations is extended to three years. 29 U.S.C. § 255(a). In order to benefit from the three-year statute of limitations, the plaintiff bears the burden of proving "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486

U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).

The City argues that it changed its pay practices only after consultation with legal counsel, which advised that the Rescue Division employees were covered under the 7(k) exemption and therefore any violation was not willful. Again, viewing the evidence in the light most favorable to Plaintiffs on this issue, the City has not demonstrated that it is entitled to judgment as a matter of law respecting the three year statute of limitations.

It is hereby

ORDERED AND ADJUDGED that Plaintiffs' Motion for Partial Summary Judgment is GRANTED. It is further

ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this *15th* day of September, 2006.